**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Plaintiff,**

v.

**EASTERN AIR LINES, INC., Defendant.**

Civ. A. No. 88–0562.

United States District Court, District of Columbia.

March 29, 1988.
Supplemental Opinion April 7, 1988.

**846**

James L. Linsey, Cohen, Weiss and Simon, New York City, Jonathan A. Cohen, Air Line Pilots Ass'n, Intern., Washington, D.C., for plaintiff.

John J. Gallagher, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

BARRINGTON D. PARKER, Senior District Judge:

This matter, arising under the Railway Labor Act ("RLA" or "Act"), 45 U.S.C. §§ 151 *et seq.*, presents the question—does management have an unrestricted right to pursue pre-strike preparations or is it constrained by contractual obligations embodied in an existing collective bargaining agreement?

### BACKGROUND

On March 2, 1988, Air Line Pilots Association, International ("ALPA") filed a complaint accompanied by a motion for preliminary injunction seeking to prohibit Eastern Air Lines, Inc. ("Eastern" or "Air Lines") from utilizing non-Eastern pilots on training and other flights in preparation and contemplation of performing future services for the Air Lines. Plaintiff ALPA alleged that the operation of training flights by pilots not on the Eastern seniority roster [1] constituted a violation of an existing collective bargaining agreement ("Agreement") between the two. The training flights were started pursuant to a January 1988 contract between Eastern and Orion Lift Services Inc. ("Orion"), a non-union company. The contract obligated Orion to train and to supply pilots to operate Eastern's aircraft. Eastern claimed that the contract enabled it to build up a reserve of pilots in preparation for a possible strike by its machinists [2] which in turn would likely be followed by a sympathy strike of ALPA's pilots.

ALPA alleged in its complaint that Eastern's conduct triggered a "major dispute" [3] under the RLA and violated the status quo collective bargaining and noninterference obligations under the Act. Eastern moved to dismiss the complaint, contending that the alleged violation of the Agreement was a "minor dispute" and was within the exclusive jurisdiction of an arbitration board grievance procedure provided under the ALPA–Eastern Agreement and therefore not justiciable in a federal court. Eastern also opposed plaintiff's motion for preliminary injunctive relief on various grounds including a contention that if such relief were granted, it would cause severe financial hardship for Eastern while at the same time, claiming that if such relief were denied, it would not cause irreparable harm to ALPA.

---

1. The formal name of the seniority roster is Eastern Air Lines System Seniority List ("System Seniority List").

2. The recognized bargaining representative for the machinists was the International Association of Machinists and Aerospace Workers ("IAM").

3. The definition of and delineation between major disputes and minor disputes is discussed, *infra.*

An evidentiary hearing on plaintiff's motion was concluded on March 15, 1988. Testimony was received from Raymond Woolfolk an ALPA official. Two officials from Eastern also testified: Vice President for Labor Relations, Thomas Matthews and Director of Planning and Administration, William Croucher.[4]

The Court has considered and assessed the credibility of the witnesses, reviewed the relevant exhibits and other evidence submitted by each party, considered the legal memoranda and oral argument of their counsel, and concludes that Eastern's motion to dismiss the complaint should be denied and that ALPA's application for a preliminary injunction against Eastern Air Lines should be granted.

In accordance with Rule 52(a), Fed.R. Civ.P., the Court's findings of fact and conclusions of law are set out below:

### FINDINGS OF FACT

#### A.

Plaintiff ALPA is the authorized collective bargaining representative for all airline pilots employed by Eastern and is a "representative" under the Act, 45 U.S.C. § 151, Sixth. As representative for Eastern pilots, ALPA has the exclusive authority to negotiate and conclude agreements with Eastern covering rates of pay, rules and working conditions. Defendant Eastern is an air carrier principally engaged in operating passenger flights in interstate and foreign commerce. Plaintiff and defendant have been parties to successive collective bargaining agreements under the Act for more than 40 years. The current ALPA–Eastern Agreement, P.Ex. 1, is not amendable—nor subject to renegotiation—until July 1, 1988.[5]

The present Agreement expressly requires Eastern to utilize only those pilots listed on Eastern's System Seniority List to perform any and all Eastern flying. In particular, the scope clause—section 1(B) of the Agreement provides:

> It is agreed that *all present or future flying, including flight training* (except for initial factory-conducted training in newly purchased · equipment), revenue flying, ferry flights, charters and wet-leases performed in or for the service of Eastern Air Lines, Inc., shall be performed by pilots whose names appear on the then-current Eastern Air Lines' System Seniority List. (emphasis added)

The plain language of the Agreement requires that Eastern utilize pilots from the System Seniority List to perform *any* type of flying—including ferry flights that transfer Eastern aircraft from one city to another and all flying on Eastern aircraft undertaken to train pilots to perform future Eastern revenue flying.

Eastern's Vice President Matthews conceded in his testimony on March 14, 1988, that the broad language of the scope clause prohibits Eastern from utilizing pilots from other companies to operate its aircraft over the revenue routes, including passenger operations, in the absence of an ongoing pilots strike at Eastern. Tr. at 11, 12. He testified that neither the existing shortage of pilots nor the company's financial distress would justify using non-union pilots and violating the scope clause.

In accordance with the proscriptions of the scope clause, Eastern has never permitted pilots to operate training flights, ferry flights or any other flying on Eastern aircraft if their names were not included on the System Seniority List. While Eastern had occasionally "dry leased"[6] its aircraft

---

**4.** References to the transcript of testimony at the preliminary injunction hearing are designated by Tr. followed by the particular date and page.

**5.** In separate litigation recently before the Southern District of Florida, Eastern urged that the parties' most recent Agreement was no longer valid and binding. That argument was rejected by the Florida District Court, *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 670

F.Supp. 947 (S.D.Fla.1987). Although Eastern has noted an appeal from that decision, for the purposes of this litigation, Eastern's counsel acknowledges, as he must, that the parties continue to be bound by the provisions of that Agreement.

**6.** In airline industry terminology, a "dry lease" constitutes a lease of the physical aircraft and accompanying equipment without providing the pilots, flight attendants or ground personnel

to competitors or independent air carriers, it had never before leased aircraft to another company for the sole purpose of permitting non-Eastern pilots to perform Eastern revenue flying or training to perform future Eastern revenue flying on the leased aircraft.

### B.

As already noted, the source of the current dispute is the threat of a machinist strike at Eastern and a potential sympathy strike by ALPA pilots. Eastern is currently engaged in mediation negotiations with the IAM which represents mechanics and other designated personnel of Eastern. The ongoing negotiations before the National Mediation Board ("NMB") relate to certain provisions and proposed changes in the IAM–Eastern collective bargaining agreement. At the point the NMB declares an impasse in the negotiation efforts, both Eastern and IAM may then engage in lawful self-help after a 30–day cooling off period. 45 U.S.C. § 155, First. Should a machinists strike occur, followed by picketing, other unions at Eastern are entitled to honor the picket line and engage in a sympathy strike.

For several months Eastern has undertaken substantial preparations to ensure the operation of its passenger flights in the event of a machinist strike and a possible sympathy strike by ALPA. It claims that such actions have been necessary due to ALPA's refusal to indicate whether it will honor the IAM picket lines.[7] On January 1, 1988 Eastern contracted with Orion, an independent FAA certified air carrier to perform certain Eastern revenue flying on 30–days notice. The contract provides that Orion will train 350–400 pilots none of whom are included on the System Seniority List. At the preliminary injunction hearing Eastern represented that Orion pilots would only operate Eastern revenue flights in the event of a future machinist strike followed by an ALPA sympathy strike. Under the arrangement, Orion pilots would operate and maintain at least 25 Eastern aircraft (leased from Eastern) to fly Eastern passengers on Eastern's revenue routes out of Atlanta for the duration of the strike.

The contract also includes a training component and provides for the transfer of four to six aircraft to Orion for instructional purposes. Eastern is obligated to pay for all training of Orion pilots on Eastern aircraft (Pl. Ex. 9); Orion must conduct all pilot training on Eastern aircraft in accordance with training standards and policies of Eastern (Pl. Ex. 8). Because the training flights are a necessary precondition to the commencement of revenue flights, they must be completed before Orion pilots can replace the Eastern pilots and operate any Eastern aircraft.

On March 3, 1988 while still pursuing negotiations with IAM, Eastern leased a single aircraft, an Eastern Boeing 727—aircraft No. 850—to Orion to be used for training purposes. At that time an IAM strike was not imminent.[8] Defendant's decision to lease the single plane was to facilitate Orion's ability to operate Eastern's revenue flights in the event that ALPA called for a sympathy strike. In that connection, Eastern had originally scheduled an Orion crew to fly the leased aircraft from Miami, Florida to Louisville, Kentucky, where Orion was headquartered. At that time, however, Orion, had not secured necessary insurance coverage to engage in any ferry flights. Because of this and other unexpected difficulties, Eastern abandoned using Orion pilots and reassigned its own management pilots to ferry the aircraft and the Orion pilots to Louisville, Kentucky.[9]

---

necessary to operate the aircraft. A "wet lease," by contrast, constitutes a lease that provides both the aircraft and the necessary pilots, flight attendants or ground personnel.

7. Its refusal to give any indication whether it will honor the strike is not motivated by bad faith but is entirely consistent with past practice.

8. Before IAM can call a strike, the Mediation Board must determine that the parties have reached impasse. Then the union must wait a mandatory 30 days. 45 U.S.C. § 152.

9. ALPA, however, suggests the contrary and contends that Eastern made the readjustments in the ferry flight because of the picketing and

At the conclusion of the hearing on the preliminary injunction, Eastern's counsel represented that the company had leased only one aircraft to Orion for training purposes. While Vice President Matthews testified that Eastern intended to lease up to five additional aircraft to Orion for training purposes within the next several days, Eastern's counsel represented that it would not transfer any additional aircraft for a period of 14 days thus providing the Court with ample time to render a decision on plaintiff's motion for preliminary injunction. Tr., Mar. 15, 1988 at 33.

## ANALYSIS AND CONCLUSIONS OF LAW

### A.

Standard for Issuing a Preliminary Injunction

In motions for a preliminary injunction, the movant is routinely required to satisfy the following four criteria:

(1) whether plaintiff is likely to prevail on the merits; (2) whether plaintiff has shown that he will suffer irreparable injury absent interim relief; (3) whether injunctive relief would significantly harm other interested parties; and (4) whether the public interest would be served by granting or denying preliminary relief. *Randolph–Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 110 (D.C.Cir. 1986) *see also WMATC v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977).

However, when analyzing disputes brought under the RLA, the courts, where the issue have been expressly raised, have dispensed with the three requirements balancing the harm and focused exclusively on whether the plaintiff is likely to prevail on the merits. "If the dispute is major, the courts have broad powers to enjoin unilateral action by either side in order to preserve the status quo while settlement procedures go forward. Such an injunction may issue without regard to the usual balancing of the equities." *Brotherhood of Maintenance of Way Employees, Lodge 16*

protests from its members that the use of Orion pilots in the proposed ferrying operations clear-

*v. Burlington Northern R.R. Co.,* 802 F.2d 1016, 1021 (8th Cir.1986). *See Carbone v. Meserve,* 645 F.2d 96, 98 (1st Cir.) *cert. denied,* 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981); *REA Express, Inc. v. Brotherhood of Ry. Clerks,* 459 F.2d 226, 230 (5th Cir.), *cert. denied,* 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972); *Southern Pacific Transportation Co. v. Brotherhood of Railway,* 636 F.Supp. 57 (D.Utah 1986); *Texas International, Inc. v. Air Line Pilots Association International,* 518 F.Supp. 203 (S.D.Texas 1981).

Indeed, our own Circuit Court was among the first to reject the need for showing irreparable harm when considering an application for injunctive relief under the RLA. In *Southern Railway Company v. Brotherhood of Locomotive Firemen,* 337 F.2d 127, 133 (D.C.Cir.1964), our Court of Appeals wrote: "we think that a showing of irreparable injury is not required before the instant status quo injunction may issue."

■ Notwithstanding this clear line of authority, Eastern urges that a showing of irreparable harm is mandatory for the issuance of a preliminary injunction under the RLA. It attempts to distinguish *Southern Railway* on grounds that the decision involved a permanent rather than a preliminary injunction. Eastern further argues that our Circuit in subsequent cases involving preliminary injunctions has consistently required a showing of irreparable harm. *See International Brotherhood of Electrical Workers v. Washington Terminal Co.,* 473 F.2d 1156 (D.C.Cir.1972) *cert. denied,* 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973); *Delaware & Hudson Ry. v. United Transp. Union,* 450 F.2d 603, 619 (D.C.Cir.), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

Eastern's effort to distinguish *Southern Railway* is without merit and is incompatible with the express underlying reasoning of the decision. The Court of Appeals rejected a showing of irreparable injury on the grounds that

ly violated the provisions of the ALPA–Eastern Agreement.

Section 6 of the Act imposing the duty to maintain the status quo contains no qualification to the effect that the carrier has no obligation to do so unless irreparable injury would otherwise result. Moreover, the public interest in peaceful settlement of labor disputes through utilization of statutory procedures is also involved, and irreparable injury to the complaining party is not an element which bears significantly or relevantly on furthering the public interest.

*Id.* at 134. Limiting the decision to permanent injunctions would undermine the very objective of the RLA: to preserve the status quo as embodied by the collective bargaining agreement until the parties have exhausted the prescribed mediation process. *See also Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969). (" '[R]ates of pay, rules, or working conditions shall not be altered' during the period from the first notice of a proposed change in agreements up to and through any proceedings before the National Mediation Board.") If plaintiffs were required to show irreparable harm to obtain a preliminary injunction, defendants would have a window of opportunity to unilaterally alter their contractual obligations. Such a rule would "emasculate the federal courts established authority to maintain the status quo." *Texas International,* 518 F.Supp. at 216.[10]

Furthermore, the two subsequent decisions of our Circuit cited by Eastern neither repudiate a broad reading of *Southern Railway* nor mandate a showing of irreparable injury. Each pays lip service to the four standard criteria but effectively collapses the requirements concerning the balance of equities into an analysis of the probability of success on the merits. Thus in *International Brotherhood of Electrical Workers,* 473 F.2d at 1167, the court "discussed ... the particular importance of the trial court's assessment of the movant's probability of success on the merits, and ... noted that frequently the finding of irreparable injury ... depends on an appraisal of the validity ... of the legal premise." Similarly, the court in *Delaware & Hudson Ry. Co.,* 450 F.2d at 622 directed trial courts "to let the judicial action depend on an appraisal of the legal rights of the parties on the merits." [11]

Moreover, the special procedures required under the RLA make the routine definitions and temporal meanings of the terms preliminary versus permanent injunctions less meaningful. Indeed, a "permanent" injunction under the RLA is more closely akin to a preliminary injunction in a routine case; it lasts only until the parties have completed the mediation process prescribed under the RLA.[12]

Therefore, based on the case law in this and other circuits, together with the objectives of the RLA this Court concludes that ALPA need only demonstrate the likelihood of prevailing on the merits to warrant a preliminary injunction. Once it has demonstrated that Eastern's actions have triggered a major dispute under the Act, the Court is obligated to enjoin that action to preserve the status quo while the parties proceed to mediation under the RLA.

■ Although a balancing of the harms and in particular a showing of irreparable

---

**10.** Ironically enough, in *Texas International,* management advocated dispensing with the irreparable harm requirement. It sought an injunction to prohibit ALPA from pursuing its "sick-out" policy employed to deliberately slow down and disrupt the carrier's operations until the parties exhausted the mediation procedures under the RLA. The court held that ALPA's actions triggered a major dispute under the RLA and this alone, was enough to enter a preliminary injunction.

**11.** These decisions clearly minimize the importance of any showing of irreparable injury. They directly rebut Eastern's contention that the standards for showing irreparable harm are stringent and difficult to meet.

**12.** Furthermore, in this proceeding, the Court has held four days of hearings and heard testimony from three major witnesses. A substantial amount of testimony and evidence was presented at the hearings. Although the parties will have an opportunity to proffer additional evidence before it renders a final decision, the Court notes that it is blessed with an unusually abundant amount of evidence upon which to decide plaintiff's motion for a preliminary injunction.

injury is not necessary for issuance of a preliminary injunction, the Court finds that ALPA has satisfied the traditional criteria for such relief. Plaintiff has effectively demonstrated that denial of an injunction would cause irreparable injury. Permitting Eastern to unilaterally repudiate the collective bargaining agreement would undermine the union's role as an effective bargaining agent for the pilots. Courts have uniformly held that subverting the union's representational status constitutes a sufficient threat of injury to warrant preliminary injunctive relief. *See International Ass'n of Machinists v. Northwest Airlines, Inc.*, 674 F.Supp. 1387, 1392 (D.Minn.1987); *Local 553 Transport Workers of America v. Eastern Air Lines, Inc.*, 544 F.Supp. 1315, 1328 (E.D.N.Y.), *aff'd as mod*, 695 F.2d 688 (2d Cir.1982). Furthermore, the public interest is best served by maintaining the status quo and requiring Eastern to comply with the dispute resolution procedure established under the Act. *See Railway Labor Executives' Association v. Pittsburgh & Lake Erie Railroad Company*, 831 F.2d 1231 (3rd Cir.1987). As explained, *infra* 855, the very objective of the RLA is to avoid potentially disruptive strikes by prohibiting parties from unilaterally abrogating their collective bargaining agreement before exhausting the mediation process.

Finally, issuing a preliminary injunction will not harm Eastern for it cannot contend that compliance with the terms of its collective bargaining agreement constitutes irreparable injury. Such an argument would allow an effective emasculation of the agreement. Eastern should have considered the ramifications of the scope clause before it entered into the collective bargaining agreement. Moreover, an injunction would not restrict Eastern from protecting itself against a potential strike.

It is free to engage in alternative strike contingency preparations as long as the strike plans do not violate its present contractual obligations. *See infra* 855–56.

**B.**

Success on the Merits: Is This a Major or Minor Dispute Under the RLA?

■ The central and overriding issue presented in this proceeding is whether the leasing of Eastern aircraft to Orion for the purpose of training Orion pilots to operate Eastern passenger flights constitutes a major or minor dispute under the RLA. If it is a major dispute, then the conduct must be enjoined until the parties complete the mediation process prescribed by the RLA. § 2, Seventh, 45 U.S.C. § 152.[13] If its actions only constitute a minor dispute, then this Court has no authority to enter an injunction. Exclusive jurisdiction over minor disputes is vested in the National Adjustment Board. 45 U.S.C. § 153; *see International Brotherhood of Electrical Workers v. Washington Terminal Company*, 473 F.2d 1156, 1173 (D.C.Cir.1972).

**1.**

The traditional standard for differentiating between major and minor disputes was set forth by the Supreme Court in *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), *reaff'd*, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). The Court stated that:

[a major dispute] relates to disputes over the formation of collective agreements or efforts to secure them. They arise when there is no such agreement or where it is sought to change the terms of one.... [A minor dispute], however contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring

**13.** The RLA prescribes a lengthy administrative procedure for changing provisions in a collective bargaining agreement. If a carrier intends to alter the agreement, it must first give the union notice. § 6, 45 U.S.C. § 156. Then the parties are obligated to negotiate the proposed modifications. *Id.* § 152, Second. If mediation fails, either party may present the dispute to the National Mediation Board. *Id.* While the parties are undergoing mediation, they are obligated to maintain the status quo and either side can bring an action before the federal courts to enjoin violations of the status quo. *Id.* §§ 155 First, 156, 160. *See Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 152, 90 S.Ct. 294, 300, 24 L.Ed.2d 325 (1969).

about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.

*Id.* at 723, 65 S.Ct. at 1290.

Our Court of Appeals adopted the above standard in *Southern Railway Company v. Brotherhood of Locomotive Firemen and Enginemen,* 384 F.2d 323, 327 (D.C. Cir.1967) and *International Brotherhood of Electrical Workers v. Washington Terminal Company,* 473 F.2d at 1172–1173. In the latter opinion, the court clarified the application of the standard stating that a dispute is major if "the change being imposed ... *is in nowise contemplated or arguably covered by the agreement....* [W]here the position of one or both of the parties is *expressly and arguably predicated on the terms* of the agreement, as illuminated by longstanding practices, the question of whether the position is well taken involves a minor dispute." Quoting *Switchmen's Union v. Southern Pac. Co.,* 398 F.2d 443, 447· (9th Cir.1968) (emphasis in original).

According to this standard, actions which unilaterally repudiate the collective bargaining agreement trigger a major dispute under the RLA. *See Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); [14] *Brotherhood of Maintenance of Way Employees v. Chicago and North Western Transportation Company,* 827 F.2d 330, 333 (8th Cir.1987) (new rule disciplining employees for possession of narcotics constituted a formal change of the collective bargaining agree-

ment and therefore was a major dispute under the RLA); *St. Louis Southwestern Railway Company v. Brotherhood of Railroad Signalmen,* 665 F.2d 987 (10th Cir.1981) *cert. denied,* 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982) (contracting out services to non-union employees violates the collective bargaining agreement and constitutes a major dispute under the RLA); *Local 553, Transport Workers Union of America v. Eastern Air Lines, Inc.,* 544 F.Supp. 1315 (E.D.N.Y.) *aff'd as mod.,* 695 F.2d 688 (2d Cir.1982) (use of Braniff flight attendants on Eastern's foreign flights violated Eastern's collective bargaining agreement triggering major dispute); *United Indus. Workers v. Board of Trustees of the Galveston Wharves,* 351 F.2d 183, 190 (5th Cir.1965) (leasing out of assets to a non-union entity violated agreement and constituted a major dispute under the RLA).[15]

Following this clear line of authority, the Court concludes that Eastern's conduct has triggered a major dispute. The training of Orion pilots on Eastern aircraft constitutes a unilateral repudiation of the collective bargaining agreement. Eastern has failed to offer a reasonable interpretation of the contract which would justify its conduct nor has it proven that this type of leasing arrangement is justified by past practices. Furthermore, Eastern's argument that it is entitled to pursue strike preparations irrespective of the terms of its agreement with ALPA is completely spurious; it is directly rebutted by the case law and the policy prescriptions underlying the RLA.

### 2.

There can be no dispute that the scope clause requires that Eastern utilize only

---

**14.** Indeed, the Court in *Shore Line,* held that the collective bargaining agreement only establishes the minimum terms of the status quo working conditions. "[S]tatus quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement. 396 U.S. at 153, 90 S.Ct. at 301.

**15.** Eastern appears to reject this clear line of authority, urging that every dispute must be considered minor, once the parties have raised disagreements over the meaning of their collective bargaining agreement. Eastern's position

would effectively allow the parties, rather than the courts, to define the nature of the dispute. Clearly, the parties would not proceed to court if they did not disagree over the terms of the collective bargaining agreement. However, the parties' assertion of a disagreement, alone, is insufficient to transform the dispute into a minor one. A dispute is minor only if both of the interpretations are predicated on the terms of the contract. Furthermore, it is for the courts not the parties to determine whether each of the parties interpretation of the terms is plausibly grounded in the language of the agreement.

pilots whose names appear on the System Seniority List to perform "all present or future flying, including flight training .... ferry flights ... in or for the service of Eastern Air Lines." Eastern–ALPA Agreement at § 1(B). This language is clear and unambiguous and can only be interpreted one way—prohibiting non-Eastern Orion pilots from conducting flight training on Eastern aircraft in or for the service of Eastern.

Despite the clear language of the scope provision, Eastern offers the following contractual justification for its actions: It argues that the training flights are in and for the service of Orion and as such are plausibly justified under the scope clause.

The clear and unambiguous language of Eastern's contract with Orion as well as Eastern's own statements refute Eastern's position and demonstrate that the training flights must be viewed together with the revenue flights—as in and for the service of Eastern.

Eastern has conceded repeatedly that any revenue flights operated by Orion pilots will inure to the benefit of Eastern. The training flights are an integral part of the contract and a necessary precondition to qualify these Orion pilots to operate Eastern's revenue services. The only reason that Orion pilots are performing training flights is to fly Eastern revenue routes. Indeed, Orion could not satisfy its contractual obligation without conducting these training flights. As such, these training flights cannot be regarded separately from the revenue flights. They are operated together in or for the service of Eastern.[16]

Furthermore, the terms of the contract between Eastern and Orion demonstrate that the training flights are operated in and for the service of Eastern. The contract expressly provides that the "Leased Aircraft" shall be operated by Orion "for the sole and exclusive benefit of [Eastern]." Eastern–Orion Agreement at § I 1.3. Eastern attempts to discount this provision by arguing that the term "Leased Aircraft" only applies to aircraft leased to fly revenue flights. It maintains that the aircraft currently leased to Orion for training purposes is a distinct asset not governed by the quoted provision of the contract. However, Eastern's interpretation of the term "Leased Aircraft" is expressly repudiated by the clear language in the contract governing the training of Orion pilots. Indeed, the contract specifically utilizes the term "Leased Aircraft" to describe the four to six aircraft that Eastern will furnish to Orion for training purposes. Nor do the several clauses which state that the "Leased Aircraft" will be operated for the benefit of Eastern distinguish between those aircraft leased to perform revenue flights or those leased to perform training flights.

Moreover, the nature and terms of the contract support the conclusion that the training flights are being performed in and for the service of Eastern. Eastern controls the operation of the training program. It pays for the training of Orion pilots and requires that the training be conducted in accordance with Eastern's manual and practices. In addition, Eastern retains the exclusive right to employ the Orion pilots to fly Eastern revenue flights. Indeed the "insurance policy" would be worthless if Eastern could not rely on having these trained pilots available for service to operate Eastern aircraft over Eastern's routes for Eastern's passengers.

3.

 Eastern's attempt to characterize its

---

**16.** At closing argument, counsel for Eastern proffered to the Court a copy of an arbitration award involving the reach of the scope clause in a collective bargaining agreement between ALPA and Republic Airlines, Inc. In the Matter of the Arbitration Between Air Line Pilots Association, International and Republic Airlines, Inc. RC–MEC–85–9 (Sept. 30, 1986).

Decisions by arbitrators offer no precedential value and are not binding on federal courts. Even if it were authoritative, this decision is readily distinguishable from the issues presented. That case involved the subcontracting of feeder lines to a third level feeder carrier, Simmons. The arbitrator determined that Simmons was not flying in or for the service of Republic because Republic did not retain operational control of the carrier, its employees or aircraft and did not control the carrier's flight destinations or schedules. Eastern, on the other hand retains control over all these matters.

leasing arrangement as a dry lease [17], authorized by past practice is equally unavailing. There is no dispute that dry leases are permissible under the scope clause, however, the Eastern–Orion contract cannot be interpreted plausibly as a dry lease.

Dry leases customarily involve the transfer of aircraft to an independent carrier which then uses it to further its own business. The lessor typically relinquishes all control over how the aircraft is utilized. Eastern has entered into numerous dry leases in the past [18] where it has leased aircraft to an independent air carrier. For example, it has leased planes to Federal Express, which in turn has used the aircraft for the benefit of *Federal Express*, flying *Federal Express* routes and distributing *Federal Express* parcels.

Eastern's contract with Orion differs markedly from the type of dry leases it has entered into in the past. Orion would operate the aircraft for the benefit of *Eastern*, flying *Eastern* routes and *Eastern* passengers. Further, rather than relinquishing control over the aircraft, Eastern retains complete control over how the aircraft are utilized. Not only is Eastern paying for and controlling the training program but it has reserved the right to designate the specific flights, times and schedules which Orion must fly. Finally, Mr. Matthews testified that Eastern has never before entered into this type of a lease where it trained non-Eastern pilots to operate Eastern flights. His admission thoroughly undermines Eastern's attempt to claim that its existing lease is justified by past practice.

Eastern's attempt to transform its disagreement into a minor dispute merely by designating the contract a dry lease must be rejected. Such an analysis elevates form over substance and would permit Eastern to defeat the clear, unambiguous language of the scope clause merely by the labels it chooses.

### 4.

Eastern's argument that it has an absolute right to engage in pre-strike preparations irrespective of its collective bargaining commitments must be rejected as inconsistent with the case law and the statute. Indeed, the two decisions that Eastern relies upon to support its proposition are inapposite. *Air Line Pilots Association International v. United Air Lines, Inc.*, 802 F.2d 886 (7th Cir.1986); *Teamsters v. World Airways*, 111 L.R.R.M. 2170 (N.D.Ca.1982). Neither involved a claim that the training programs violated the relevant scope clause or any other contractual provision. In *United Air Lines*, the court stated that "it is unchallenged that the relevant collective bargaining agreement made no mention of defendant's pilot training practices and procedures." 802 F.2d at 916.[19] Similarly, the court in *World Airways* found that the training program did not trample upon any preexisting contractual obligations. Moreover, the court expressly rejected Eastern's claim that pre-strike preparations are per se legitimate. It held that only those training programs which do not interfere with ongoing operations and are taken in good faith are consistent with the RLA.

Eastern's reliance on *Brotherhood of Ry. and Steamship Clerks v. Florida East Coast Ry.*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966) for the proposition that it has the "unfettered" right to engage in strike planning "self help" measures to fulfill its duty to operate in the event of a strike is equally misplaced. *Florida East Coast* involved the legitimacy of self help

---

**17.** *See supra* note 5 for definition of a dry lease in contrast with a wet lease. Interestingly enough, as represented by Eastern's counsel, the original definition of the term wet lease was that fuel was included. In a dry lease it was not. Ironically the Eastern–Orion contract provides that Eastern supply all fuel and oil for Orion flown flights. Article II(c).

**18.** Mr. Phil Bakes, President and Chief Executive Officer of Eastern declared that Eastern has

leased or sold 129 aircraft to other air carriers. *See* Affidavit of Phil Bakes ¶ 12 (Jan. 29, 1988) Exhibit C attached to Defendant's Opposition to Plaintiff's Motion for Emergency Injunctive Relief.

**19.** Interestingly, the court in *United Air Lines* concluded without explanation or analysis that the dispute was a major one. *Id.* at 895.

measures taken in the face of an ongoing strike. Indeed, the Court held that self-help measures were available only *after* the parties had exhausted all the procedures provided under the RLA. Further, contrary to Eastern' suggestion, the Court never granted management an "unfettered" right to abrogate its contractual obligations even in the face of an ongoing strike. "[A]ny power to change or revise the basic collective agreement must be *closely confined and supervised....* The carrier must respect the continuing status of the collective bargaining agreement and *make only such changes as are truly necessary." Id.* at 247–248, 86 S.Ct. at 1425.[20] (emphasis added).

Eastern's attempt to extend the limited ruling in *Florida East Coast* to the pre-strike realm is inconsistent with the case law and the Act. Indeed, such an extension would controvert the core objectives of the RLA. The central purpose of the "interminable, protracted" mediation process prescribed by the RLA is to "encourage collective bargaining by the parties 'in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce especially in cases where major disputes are involved.'" *United Air Lines,* 802 F.2d at 895 (quoting *Detroit & Toledo Shore Line Railroad v. United Transportation Union,* 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969)). To accomplish this goal and to ensure the continuation of vital public services, the RLA bars either party from unilaterally altering the established status quo until the mediation process has been exhausted. 45 U.S.C. §§ 152, Seventh, 155, First, 156, 160. Allowing management to pursue self help measures in abrogation of its collective bargaining agreement before a strike has been called,[21] would thwart this requirement. The RLA does not provide for such an exception in the name of pre-strike preparations. Indeed, such an exception could very well provoke the very strike that the RLA procedures were designed to prevent.

Nor can Eastern justify its training program by arguing that it would otherwise face a financial crisis. Even if the Court were to accept Eastern's cries of potential insolvency, these predictions do not provide a basis for thwarting the clear proscriptions of the RLA. More importantly, the record demonstrates that Eastern can adopt alternative strike contingency plans which would protect it from a potential strike while not violating its existing collective bargaining commitments. At the preliminary injunction hearing, Mr. Matthews identified several such options. *See* trans. at 62–64 (March 14, 1988). Eastern could hire permanent strike replacements to fly the aircraft in the event of a strike[22] or subcontract to a third party carrier already qualified to operate passenger routes.[23]

## CONCLUSION

Eastern's statements to its own employees, to Congress and to this Court that it

---

**20.** Preservation of the terms of the collective bargaining agreement has become even more crucial following the Airline Deregulation Act of 1978, 49 U.S.C.App. § 1301 *et seq* and the Department of Transportation's subsequent policy of refusing to impose labor protective provisions as a matter of course. Since the collective bargaining process is the employee's only means for protecting their interests, *see Airline Pilots Ass'n v. Department of Transportation,* 791 F.2d 172 (D.C.Cir.1986), the courts must carefully guard the terms of the agreement.

**21.** ALPA has made no commitment to IAM that it would honor the picket lines if IAM were to go out on strike. Indeed, there was testimony at the hearing that ALPA and IAM have their own disagreements stemming from IAM's refusal to join in in an across the board pay cut with all the other unions at Eastern.

**22.** Eastern contended that it rejected this alternative because it might leave Eastern with an overflow of pilots at the conclusion of a strike forcing Eastern to furlough some of the replacements. This fear, appears inconsistent with Eastern's remonstrances that it currently faces a serious pilot shortage. Indeed, it should welcome the influx of permanent replacements to fill its depleted ranks.

**23.** It should be stressed that the preliminary injunction imposed herein is a very narrow one and only restricts Eastern from training non-Eastern pilots on Eastern aircraft to prepare for flying Eastern routes. Management remains free to engage in pre-strike preparations to ensure the continuation of its operations in the event of a strike. It is only restricted from pursuing self-help measures which violate its contractual obligations prior to any threatened strike.

leased the aircraft solely to prepare Orion pilots to fly Eastern passengers on Eastern aircraft [24] undermine its belated attempt to argue otherwise. Based on the facts available at this time, this Court concludes Eastern's actions violate the collective bargaining agreement and constitute a major dispute under the RLA. An injunction is appropriate at this time to preserve the status quo until the parties have completed the mediation process.

An appropriate Order shall be entered to effectuate this Opinion.

### SUPPLEMENTAL OPINION

On March 29, 1988, this Court published a Memorandum Opinion enjoining defendant Eastern from violating the scope clause, section 1(B) of its existing collective bargaining with plaintiff ALPA. On the next day, March 30, counsel for the parties appeared before the Court for the purpose of determining an appropriate security obligation pursuant to Rule 65 (c), Fed.R.Civ.P.

At that hearing Eastern's counsel sought what he termed as a "clarification" of the Court's ruling particularly in light of a single sentence in a footnote, no. 23 at page 855, of the Court's Memorandum Opinion. He also raised questions as to the validity of subsections (d) and (e) of the Court's March 29, 1988 Order Granting Preliminary Injunction, contending that the sections were overbroad and constituted a "blanket injunction" in violation of the provisions of the Norris–LaGuardia Act, 29 U.S.C. § 107. Counsel argued further that the two sections might possibly prejudice them in other litigation between the parties now pending before this Court.[1]

### A. Scope of the Preliminary Injunction Order

■ As to the first point involving footnote 23, Eastern's counsel argued that he interpreted that footnote as limiting the injunction to the training of non-Eastern pilots on aircraft *owned* by Eastern. Accordingly, he represented that his client understood and expected "that Orion would procure substitute aircraft from other sources elsewhere in the airline industry"[2] for the training of Orion pilots. In turn, Eastern would bear the cost of the substituted arrangement as an added cost of the agreement with Orion. He also represented that such a leasing arrangement could be secured for six airplanes at a cost of 80 thousand dollars per plane or a total cost of nearly one half million dollars. Thus defendants sought a security bond that would cover at least its leasing costs.

In the Memorandum Opinion of March 29, 1988, the Court concluded that Eastern's conduct was in clear violation of the collective bargaining agreement between Eastern and ALPA. In relying upon footnote 23, limited to three sentences and a total of eight lines, Eastern's counsel employed a narrow and "crabbed" interpretation of the Court's March 29 ruling as well as the accompanying Order. Indeed, Eastern's counsel has completely missed the thrust of the footnote and for that matter the thrust and scope of the entire Opinion. That footnote, limited as it was, was not designed in any way to eclipse and obscure the full body and text of the 26–page Opin-

---

**24.** Eastern advised its flight attendants that training flights flown by "pilots from other companies ... will be Eastern revenue flying, performed in or for the service of Eastern Airlines ..." Notice to all Flight Attendants, Exhibit 5 attached to Plaintiff's Motion for Immediate Injunctive Relief.

Eastern officials testified before Congress that Orion would be flying in and for the service of Eastern. Further, an official stated that it leased aircraft to Orion even before a strike was on the horizon "because you do not train pilots overnight." Exhibit 4, unofficial Transcript of Hearing on Eastern Air Lines' Plans to Subcontract Flight Operations to Orion Air, before the

Subc. on Government Activities of the House Comm. on Government Operations 69 (Testimony of Mr. Stephen J. Kolski, Vice President of Eastern Air Lines).

**1.** *Air Line Pilots Association v. Eastern Air Lines,* C.A. 87–2002 (charging Eastern with subverting the representational status of ALPA); *Eastern Air Lines v. Air Line Pilots Association,* C.A. 88–0296 (seeking a declaratory judgment that transfer of the Eastern Air Shuttle would not violate the Railway Labor Act).

**2.** Hearing Transcript, March 30, 1988, at 4 (lines 9–11).

ion. Moreover, Eastern's counsel focused only on the first of the three sentences. He completely overlooked or ignored a crucial point of the footnote, the final sentence which provided that Eastern "is only restricted from pursuing self-help measures which *violate its contractual obligations."* As discussed in the main text of the opinion, Eastern's obligations under the scope clause prohibited it from using pilots who were not on its seniority roster to conduct "training flights ... *in or for the service of Eastern."*

As emphasized in the March 29, 1988 ruling, the language of the scope clause is clear and unambiguous. It does not simply restrict training flights on Eastern-owned aircraft as Eastern suggests. It is more expansive, prohibiting training flights operated "in or for the service of Eastern." Nor was the determination that the training flights were being operated in or for the service of Eastern predicated on the fact that the flights were conducted on Eastern aircraft. This decision was based on the following factors: that the training flights were a necessary precondition for flying Eastern revenue flights and therefore could not be viewed separately from the revenue flights [3], that Eastern was paying for the training program, and that the training was being conducted pursuant to Eastern's manual and practices.

Eastern's sole reason for pursuing these training flights has not changed—to qualify pilots to fly its revenue flights in the event of a strike. Whether or not the training is actually conducted on Eastern aircraft with Eastern's logo or on aircraft leased from another carrier does not alter the fact that the training flights are in or for the service of Eastern. Indeed, there is little difference between Eastern providing Orion with its own aircraft or providing Orion with substitute aircraft that it has leased from another carrier on the open market. Once Eastern leases the aircraft, those planes are properly viewed as Eastern's own. It owns the aircraft for the term of the lease and dictates how the aircraft are used—in this instance to train Orion pilots.

Nor can Eastern seek comfort by contending as it did at the March 30 hearing that the issue of providing Orion with non-Eastern aircraft was never raised in the complaint or at the hearing on the preliminary injunction. Indeed the testimony of Raymond Woolfolk, the sole witness presented by ALPA, directly contradicts Eastern's position. When asked under cross examination whether the union's objections were limited solely to the operation of training flights on Eastern aircraft by Orion, he responded "[n]o ... the key would be whether it is in and for the service of Eastern." Hearing Transcript, March 9, 1988 at 75. Similarly, although this action originally arose from the operation of training flights on Eastern aircraft, the complaint was not limited to that incident. The core of ALPA's complaint was that the training flights were being conducted in or for the service of Eastern in violation of the scope clause. It was that broader issue that was addressed and resolved in the Court's March 29 ruling. Thus, enjoining Eastern from providing Orion with aircraft leased from another carrier is thoroughly consistent with and indeed, mandated by the findings and conclusions entered by the Court.

Finally, the Court rules that Eastern's objections to the last two provisions, sections (d) and (e) of the preliminary injunction order, are well taken. They are overly broad and can be construed to be a blanket injunction. Given the specific requirements of Rule 65(d), Fed.R.Civ.P., and section 7 of the Norris–LaGuardia Act, 29 U.S.C. § 107, those paragraphs should be deleted.

**B. *Appropriate Bond Amount***

Determination of the amount of an injunction bond is addressed to the sound discretion of the district court. *Aluminum Workers Intern. Union v. Consolidated Aluminum Corporation,* 696 F.2d 437, 446 (6th Cir.1982). The security should be sufficient to reimburse defendant

---

**3.** There was never any dispute that the revenue flights were in or for the service of Eastern.

for any actual damages it may suffer should the preliminary injunction be found to have been improvidently granted. *See Edgar v. Mite Corp.*, 457 U.S. 624, 649, 102 S.Ct. 2629, 2644, 73 L.Ed.2d 269 (1982); *Monzillo v. Biller*, 735 F.2d 1456, 1461 (D.C.Cir.1984).

 In view of the fact that this injunction does not prohibit Eastern from pursuing alternative strike contingency plans,[4] the Court determines that a bond of $25,000 is reasonable and appropriate. That amount will fully compensate Eastern for any loss or damage caused by the injunction in the event that the relief was improperly granted.

An appropriate Order follows.

### AMENDED ORDER GRANTING PRELIMINARY INJUNCTION

On basis of the representations made by counsel for the parties at a hearing held before the Court on March 30, 1988, dealing with the Court's ruling and order on ALPA's application for a preliminary injunction, both entered on March 29, 1988, and the Court having fully considered the questions and concerns of counsel, it is

### ORDERED

That the Order Granting Preliminary Injunction entered on March 29, 1988, is vacated and in lieu thereof it is this 7th day of April, 1988,

### ORDERED

That defendant's Motion to Dismiss is denied;

That plaintiff's Motion for a Preliminary Injunction is granted and pending the trial of this matter on the merits; it is

FURTHER ORDERED that defendant Eastern Air Lines, Inc., ("Eastern") and its directors, officers, agents, employees, and attorneys shall refrain and are preliminarily enjoined from:

(a) Permitting or utilizing Orion pilots or any pilots employed by carriers other than Eastern to perform flight training, ferry flights or any other present or future flying of any Eastern aircraft in preparation to operate Eastern revenue flights or in any other way in or for the service of Eastern in the absence of a strike by Eastern pilots;

(b) Removing any Eastern aircraft from Eastern revenue flying operations for the purpose of permitting Orion pilots, the pilots of any carrier other than Eastern, or any pilots whose names do not appear on the Eastern Air Lines System Seniority List to perform flight training, ferry flights or any other flying on such aircraft in or for the service of Eastern;

(c) Permitting or utilizing any pilots whose names do not appear on the current Eastern Air Lines System Seniority List to perform revenue flying, passenger flying or any other present or future flying of any Eastern aircraft in or for the service of Eastern in the absence of a strike by Eastern pilots; and it is

FURTHER ORDERED that pending trial of this matter on the merits, this Court shall retain jurisdiction for the purpose of assuring that there is compliance in all respects with this Order and judgment; and it is

FURTHER ORDERED that plaintiff file a bond in cash or corporate surety in the sum of twenty-five thousand dollars ($25,000) as security in the event that the injunction was improvidently granted.

---

4. Memorandum Opinion March 29, 1988, pp. 855–56.