AIR LINE PILOTS ASSOCIATION INTERNATIONAL, Plaintiff,

v.

EASTERN AIR LINES, INC., Defendant.

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, et al., Plaintiffs,

v.

EASTERN AIR LINES, INC., et al., Defendants.

TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, et al., Plaintiffs,

v.

EASTERN AIR LINES, INC., Defendant.

Civ. A. Nos. 87–2002, 88–0870 and 88–0364.

United States District Court, District of Columbia.

Aug. 30, 1988.

James L. Linsey, Cohen, Weiss & Simon, New York City, Jonathan A. Cohen, Air Line Pilots Ass'n, Intern., Washington, D.C., for Air Line Pilots Ass'n.

Arthur M. Luby, O'Donnell, Schwartz & Anderson, Washington, D.C., David Rosen, Catherine Minuse, O'Donnell & Schwartz, New York City, for Transport Workers Union of America.

Joseph Guerrieri, Jr., Samuel Issacharoff, Guerrieri, Edmond & James, Robert Burka, David Brown, Knopf & Burka, Washington, D.C., for Intern. Ass'n of Machinists & Aerospace Workers.

Michael J. Madigan, John J. Gallagher, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., David Boies, Cravath, Swaine & Moore, New York City, for Eastern Air Lines, Inc.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

### I.

### INTRODUCTION

In this proceeding, brought under the Railway Labor Act ("RLA" or "Act"), 45

U.S.C. § 151, *et seq.* (1981), plaintiffs Air Line Pilots Association, International ("ALPA"), International Association of Machinists & Aerospace Workers ("IAM") and Transport Workers Union of America ("TWU") seek declaratory, injunctive, monetary and other appropriate relief against defendant Eastern Air Lines, Inc. ("Eastern"). The three unions charge in separate verified complaints that Eastern has violated various provisions of the Railway Labor Act. Since filing their original complaints,[1] plaintiffs claim that Eastern, by engaging in a recently announced proposed course of action and conduct, violated several independent obligations of the Railway Labor Act: (1) the obligation to maintain the status quo during Section 6 bargaining concerning the changes in question; (2) the obligation to maintain agreements and to initiate and exhaust Section 6 bargaining before altering those agreements and the status quo; and (3) the obligation to refrain from action interfering with and undermining its bargaining representatives.

The proposed action triggering plaintiffs' present application for preliminary injunctive relief emerged from Eastern's July 22, 1988 public announcement of its intent to effect significant operational "downsizing" and "restructuring." "We're going back to our roots ..." explained Eastern's President and Chief Executive Officer, Phil Bakes. The proposal includes reducing Eastern's work force by nearly 12 percent through furloughing 4,000 employees, including 1,000 flight attendants, 1,000 machinists, and 500 pilots. It also calls for eliminating and reducing two major hub services, terminating all services to 14 designated cities, terminating point-to-point service in several northeast United States cities, closing a pilot domicile center, and disposing of 33 to 41 aircraft.

Eastern claims that the proposed changes are a reasonable response to the company's worsening financial condition. They are calculated to eliminate service on unprofitable routes and to permit the sale of assets which cannot be used on a reasonable economic basis. According to Eastern, such changes are not only permitted under existing labor contracts but also are consistent with past practices under its bargaining agreements. Eastern denies that the proposals are part of an ongoing program of transferring assets or work to Continental Air Lines ("Continental").

Defendant Eastern argues that plaintiffs had advance notice of the proposed changes. While it appears that plaintiffs had some prior knowledge of Eastern's planned cuts, they only became fully aware of the precise nature and scope of the downsizing and restructuring once these changes were announced on July 22, 1988. Before the airline held its press conference on that day, plaintiffs were only able to speculate and surmise as to the extent of flight reductions and possible furloughs.

Not surprisingly, plaintiffs claim that Eastern's proposals are tainted by a strong anti-union bias. They argue that the contemplated move repudiates obligations arising under existing collective bargaining agreements and under the Railway Labor Act, and only serves to promote defendant's blatant efforts to transfer Eastern's operations, assets, work, and work opportunities to Continental, which is predominantly non-union.

After a hearing on plaintiffs' motions for a temporary restraining order, Eastern was temporarily restrained on August 4, 1988, from furloughing the 4,000 employees and with counsels' consent, the order was extended to August 26, 1988.[2]

Extensive hearings were held on plaintiffs' several motions for a preliminary injunction. For seven days the Court considered the testimony and assessed the credibility of the witnesses presented by the parties, and reviewed the declarations and exhibits proffered in support of their

---

1. ALPA filed its complaint on July 21, 1987, IAM on March 31, 1988, and TWU on February 18, 1988. The complaints had been consolidated only for purposes of pretrial discovery.

2. The Court entered a "Notice of Ruling" on August 26, 1988 advising the parties that it would grant plaintiffs' application for a preliminary injunction and that a Memorandum Opinion would be filed on August 30, 1988.

claims and defenses. The supporting legal memoranda and the final arguments of counsel have all been fully considered.

For the reasons discussed herein, the Court determines that plaintiffs have shown by abundant and credible testimony and reliable documentation that Eastern Air Lines' proposed furloughing of 4,000 employees is illegal and they should be enjoined preliminarily from pursuing such a proposal.

In accordance with Rule 52(a), Fed.R. Civ.P., the Court's Findings of Fact and Conclusions of Law are submitted.

## II.

### FINDINGS OF FACT

1. Plaintiffs ALPA, IAM and TWU are, respectively, the authorized collective bargaining representatives for Eastern's pilots, Eastern's aircraft mechanics and ground services personnel (airline servicers, flight dispatchers, baggage and cargo handlers); and for all Eastern flight attendants.

As of December 31, 1987, 60 percent of Eastern's 32,500 full-time employees were covered by agreements with ALPA, IAM and TWU.

2. Defendant Eastern is a common air carrier, subject to the provisions of the RLA and is engaged in both interstate and foreign commerce. As the nation's sixth largest air carrier, it provides substantial passenger and cargo service throughout the East Coast, a limited amount of east-west service, and a profitable air shuttle service serving New York City, Washington, D.C., and Boston.

3. ALPA and Eastern have been parties to successive collective bargaining agreements for more than 45 years. Their most recent agreement became amendable on July 1, 1988, and the parties are currently engaged in contract negotiations pursuant to Section 6 of the RLA, 45 U.S.C. § 156 (1981).

IAM and Eastern have been parties to successive collective bargaining agreements for more than 40 years. Their most recent agreement became amendable on October 2, 1987. The parties have been engaged in bargaining negotiations since October 1987. In January 1988, they began negotiations under a mediator appointed by the National Mediation Board pursuant to Section 5, First of the RLA, 45 U.S.C. § 155, First (1981).

TWU and Eastern have also been parties to successive agreements for many years. Their current agreement does not expire until December 31, 1988, when it becomes amendable.

### The Role of Texas Air Corporation

4. Texas Air Corporation ("Texas Air") is a successor to Texas International Airlines. Texas Air is a holding company with investments in airlines and related businesses. It owns all of the common stock of Eastern and Continental. Eastern was acquired by Texas Air in November 1986; Continental was acquired in 1982.

Texas Air is controlled by a closely held company, Jet Capital Corporation ("Jet Capital"). With few exceptions, almost all of Jet Capital's activities are controlled and directed entirely by Texas Air. Frank Lorenzo and a few other Texas Air officers and outside investors own Jet Capital, which has a controlling 34 percent interest in Texas Air.

5. The Texas Air family includes the following airline support companies: SystemOne (providing a computer reservation system and data processing support); TAC Fuel Management (providing central fuel purchasing services); Continental Eastern Sales (a marketing company jointly owned by Continental and Eastern); and a number of aircraft holding companies that lease equipment to other subsidiaries.

6. Through personal control and ownership of 50.7 percent of Texas Air voting stock, Mr. Lorenzo dominates all operations. He is President, Chief Executive Officer, and Chairman of Texas Air Corporation. He also serves as board chairman of Eastern, Continental and SystemOne.

7. The Eastern–Texas Air 1986 sale was prompted by Eastern's sagging financial condition and profitability. Eastern

blamed its failure to secure labor concessions that could have restored it to financial health. Others pointed to poor management decisions. Nevertheless, Eastern was considered an attractive investment when Texas Air acquired the airline. Texas Air not only believed that reducing labor costs would be critical to Eastern's future viability but also that it could be achieved. After the 1986 acquisition, Eastern's initial objectives were directed toward reducing overhead, increasing market share, improving financial performance, and lowering costs—particularly labor costs.

To accomplish this, Eastern has concentrated on building liquidity to improve its bargaining position, and, if necessary, selling assets to build up cash. Labor representatives believe that Eastern's management is interested only in short-term profits and not in the long-term viability of the company.

8. Since acquisition by Texas Air in 1982, Continental has operated predominantly as a non-union air carrier. Only 20 percent of its 33,500 employees were unionized as of December 31, 1987. Before 1982, Continental had a long-standing collective bargaining relationship with ALPA, IAM, and other labor unions. Through the change in ownership, massive wage and benefit concessions were achieved. When the unions objected, Continental responded by filing for bankruptcy, repudiating its labor agreements and imposing across-the-board reductions in wages and benefits. Shortly thereafter, strikes followed and Continental not only terminated all bargaining negotiations but also refused to recognize or bargain with either ALPA or IAM. In Continental's view, its pilots and ground services personnel are not represented by any labor union; its flight attendants, however, are currently represented by the Union of Flight Attendants.

9. Immediately after the Eastern acquisition, Texas Air placed its former officials as well as Continental's officials, in key management positions at Eastern. At one time, almost all Eastern directors and offi-

cers held comparable posts at Continental or Texas Air.

### The Coordination of Efforts: Texas Air, Eastern and Continental

10. Since Texas Air's purchase of Eastern in 1986, there has been considerable overlap between Eastern and Continental, in both route and hub systems. This has been particularly true in the Northeast–Florida market, including hubs at Newark, New Jersey and Philadelphia, Pennsylvania; at Continental's Houston, Texas hub; in the east-west market between Eastern's Kansas City hub and Continental's Denver hub; and on routes which were serviced by both Eastern and Continental.

11. Before the sale was completed, Texas Air, Eastern and Continental, through their interrelated management and boards, began to coordinate their operations. Officials from the three companies participated in a series of meetings and other conferences in order to share intentions. They became partners and formed a close relationship so as to resolve problems of overlapping flying routes and hub operations at Eastern and Continental. The meetings were attended by responsible senior officers of the three companies.

12. Shortly after the meetings began, Eastern President Phil Bakes sent a memorandum on coordination to certain Texas Air and Continental officials suggesting that there should be regular contact between the companies.

Among the issues discussed at the meetings were: (1) conflicts between hubs in the same place and their future development; (2) operation of routes and flights at Newark; (3) competition between Eastern's Kansas City hub and Continental's Denver hub; (4) capacity levels in joint Eastern and Continental markets; and (5) market objectives and pricing strategy.

13. Eastern's representation regularly consulted with Continental's concerning changes in marketing and route structure. Eastern directly urged Continental to take over former Eastern routes like Miami–London, stressing that Continental's lower labor cost structure would enable it to op-

erate such routes profitably. At meetings and conferences with Continental, Eastern's fall schedules, projections, including plans to downsize its operations were discussed. President Bakes made Continental aware of Eastern's future cuts in operations. Thus Continental could determine if it wanted to replace Eastern in operating those routes.

14. The coordination of efforts was generally for purposes of assisting Continental and frustrating the collective bargaining representatives of Eastern's employees. In doing so, Eastern, in concert with Texas Air, transferred its assets, work, and work opportunities to Continental; Texas Air offered available growth opportunities to Continental rather than Eastern.

### Eastern's Efforts to Avoid Collective Bargaining Agreements

15. Since acquisition in 1986, Texas Air has exerted every effort to curb union influence at Eastern and to reduce wage rates and economic benefits previously obtained.

This is reflected in recent litigation before federal district courts in the chronology which follows:

a. In July 1986, when a Texas Air nominee became an Eastern Vice President for Flight Operations, he immediately sought cut-backs in pilot wages and benefits. This was done notwithstanding a February 1986 agreement which resulted in a 20 percent wage reduction. The wage reduction resulted in nearly a $150 million overall decrease in Eastern's pilot labor costs. A lawsuit challenging Eastern's action was concluded favorably for the Air Line Pilots. *Eastern Air Lines v. Air Line Pilots Ass'n, Int'l*, 670 F.Supp. 947 (S.D.Fla.1987).

b. In mid–1987, Eastern created Airport Ground Services, its wholly owned subsidiary, to perform fleet service work. In the past, these services had been performed by IAM union employees. Eastern's management placed its fleet service employees into a subsidiary to thereby reduce wages and to separate those employees from IAM-represented mechanics. For years, fleet service employees and mechanics had been covered by the same collective bargaining agreement between Eastern and the IAM.

The IAM sued to enjoin Eastern from violating the RLA by unilaterally changing work conditions. Judge John Pratt of this Court granted preliminary injunctive relief. He ordered and enjoined Eastern from unilaterally changing working conditions of the fleet service employees until the procedures mandated by the RLA had been exhausted. *International Ass'n of Machinists & Aerospace Workers v. Eastern Air Lines*, 125 L.R.R.M. (BNA) 3491, 3492 (D.D.C.1987).

c. In August of 1987, Texas Air, with Eastern's active support and assistance attempted to acquire all outstanding shares of a special class of Eastern preferred stock. In 1984, the company had granted the stock to its employees in return for significant wage and benefit concessions. The court enjoined a Texas Air/Eastern tender offer in part because it violated Eastern's collectively bargained promise to ALPA, IAM and TWU that the special preferred stock could be owned only by Eastern employees. *Air Line Pilots Ass'n. Int'l., et al. v. Eastern Air Line, et al.*, No. 87–2143, —— F.Supp. ——, (D.D.C. Aug. 13, 1987) (order granting preliminary injunction).

d. In early February 1988, Eastern announced that it was transferring its air shuttle operation to a new corporate entity, controlled by Texas Air. After proposing the shuttle sale, Eastern's President publicly announced that other parts of Eastern were positioned to be sold if an acceptable contract were not reached with IAM.

The IAM sought to enjoin Eastern from taking any steps to separate the shuttle operation, pending exhaustion of the RLA's mandatory dispute resolution procedures. In March 1988, Eastern was found in civil contempt of a July 2, 1987 order. While this finding was subsequently vacated by the circuit court, *International Ass'n of Machinists & Aerospace Workers v. Eastern Air Lines*, 849 F.2d 1481, 1482 (D.C. Cir., 1988), the court declined to vacate the trial court's order insofar as it enjoined

Eastern from "spinning off" the shuttle in violation of the RLA. Instead, the court allowed the IAM ten days from the issuance of the mandate to renew its request for injunctive relief. Eastern subsequently withdrew the proposed plan to spin off the shuttle.

e. Finally, in March 1988, Eastern attempted to abrogate the scope clause contained in the ALPA–Eastern collective bargaining agreement by utilizing non–Eastern pilots to operate training flights for the service of Eastern in the event of a union strike. In *Air Line Pilots Ass'n Int'l v. Eastern Air Lines*, 683 F.Supp. 845 (D.D.C.1988), Eastern's proposed conduct was enjoined as violating the status quo and collective bargaining obligations. Since then, Eastern has withdrawn the particular subcontracting arrangement and concluded a new subcontracting arrangement with Continental.

### Eastern's "Financial Crisis"

16. Credible testimony from both plaintiffs' and defendant's witnesses show that Eastern has sustained financial losses which predate the Texas Air acquisition. The losses have continued thereafter. Based on those circumstances, Eastern management claims that its July 22, 1988 proposals were clearly mandated. Their claims, however, present only one side of the picture.

17. Since the acquisition of Eastern by Texas Air, Eastern's management has contributed to Eastern's financial instability. Through a series of business decisions, management has led the company into a number of questionable loans and questionable ventures which have drained off cash reserves and other assets. While the total amount involved is not at all large, in view of Eastern's total capital structure, the fact that such decisions were made poses troublesome questions as to management's intent and whether others were purposely benefitted at Eastern's expense.

18. The Court finds that the following transactions were suspect:

a) When Texas Air acquired Eastern, the purchase price of $615 million was financed by approximately $110 million of Eastern's cash and $230 million of Eastern's preferred stock. Usually, when a company buys another, the buying company pays for the purchase. However, in the 1986 sale, Eastern actually contributed more than half of the value for Texas Air's purchase of itself.

In the same transaction, Eastern received from Texas Air a *non-interest bearing demand note* for $16 million. The note is nearly two years old but Eastern has not demonstrated any interest in demanding from Texas Air the cash it is legally entitled to receive. The lack of knowledge and the uncertainty of Eastern officials about this loan were shocking; it clearly showed that the interests and concerns of Texas Air and Continental were paramount to Eastern's.

b) Although the $16 million note is outstanding, Eastern pays Texas Air a $6 million per year management fee for management services and assistance with respect to financing. The fee is payable at $500,000 per month.

In March 1987, Eastern purchased an *unsecured* People Express note, due near year 2010 from Texas Air for $25 million. People Express is owned by Continental.

19. In early 1988, Eastern loaned Continental approximately $40 million. Ironically, two top officials of Eastern and Texas Air, Phil Bakes and Frank Lorenzo, could not answer many relevant questions about this transaction; particularly, they were uncertain as to whether outside experts were consulted on its feasibility.

20. Eastern provided Continental with $30 million to hire and train pilots and flight attendants in case of an IAM strike at Eastern. Currently, Eastern pays Continental nearly $2 million per month to maintain 419 pilots at Continental who are not Eastern employees. (Px. 10)[3] Again, it was ironic that two key Eastern officials (Bakes and Gibson) had no knowledge as to

---

**3.** References to exhibits are cited respectively as "Px" (plaintiffs) and "Dx" (defendant).

whether those pilots and flight attendants were involved in any manner with Continental's operations.

21. In April 1987, Eastern sold both its computer reservation and its internal computer operation systems to Texas Air. Prior to this, of the five U.S. airlines owning a computer reservation system, not one ever sold 100 percent of its interest. Transferring the system was a questionable decision. It deprived Eastern of significant revenues while simultaneously transferring its valuable assets to Texas Air significantly below fair market value. The testimony showed that Continental benefitted far more from the sale than Eastern.

In the same year, Eastern paid Texas Air nearly $150 million for the use of the computer system it once owned. It continues to pay approximately $10 million a month for the system. Eastern sold the system to Texas Air for a $100 million unsecured note, due in 2012, subordinated to all other notes.

The above transactions are noted simply because they aggravate the financial plight of which Eastern complains—but at the same time they are of Eastern's own making.

22. As to the findings in the paragraphs immediately above, defendant offered no testimony whatsoever challenging plaintiffs' testimony about the particular transactions. And when defendants offered testimony, it was incomplete, fragmentary and showed lack of precise knowledge by responsible officials.

In short, the record shows that Eastern has served as a lending institution to meet the needs of Texas Air and Continental. The transactions, including the $16 million Texas Air note, were all documented and a part of public records. Counsel for plaintiffs represented that the same public records do not reflect that Continental's resources are similarly used.

*Contract Provisions and Past Practice Do Not Authorize Eastern's Furloughing Actions*

23. Eastern alleges that their proposed restructuring is justified under their labor agreements with ALPA, IAM and TWU. Yet, provisions in the three agreements dealing with furloughs clearly do not authorize Eastern to cuts its labor force by 12 percent. [*See* Dx. 21 at 39–43 (Eastern/IAM Agreement); Dx. 15, Section 40 at 167–70 (Eastern/ALPA Agreement); Dx. 35 at 49–51 (Eastern/TWU Agreement)].

24. Eastern's proposed furloughs are not justified by its past practices. None of Eastern's prior job terminations are comparable in scope and breadth to the scheduled furloughs. Nor have the unions ever acquiesced to any furloughing of this magnitude. Eastern has not furloughed *any* pilots since the OPEC oil embargo in 1973 when Eastern was forced to ground its planes. Even during the Air Traffic Controllers strike in 1981, ALPA and Eastern were able to negotiate and avoid sizeable layoffs.

25. Prior furloughs have never occurred while the parties were in the process of negotiating over changes in working conditions. Eastern has complied with the Railway Labor Act in the past, by bargaining and fully exhausting the dispute resolutions procedures before implementing any furloughs. The unions have not acquiesced to any transfer of work or assets to Continental occurring after February 1986.

*Plaintiffs' Claims Of Anti–Union Bias Are Supported By The Record*

26. Much of Eastern's work and operations have been transferred to Continental which is a predominantly non-union carrier. Through direct and indirect transfers of assets, work and work opportunities, Texas Air has steadily and slowly expanded Continental's operations while simultaneously reducing Eastern's. This has resulted in Continental's total work force of non-union pilots, ground services personnel, and flight attendants, outnumbering Eastern's.

In 1988, Eastern's unions initiated a National Mediation Board ("NMB") proceeding to establish, for bargaining purposes under the RLA, that Eastern, Continental and Texas Air are a single carrier. The

three companies undertook actions with the intent to influence the NMB that if a single employer has been established, it has a workforce where non-union will outnumber union employees. Indeed, the relative number of pilots has been a subject of prime concern among Eastern officials and was discussed at a recent Texas Air board meeting. There has been an intentional shift of work to non-union employees.

27. A number of Eastern officials, including Frank Lorenzo, have consistently monitored the relative number of pilots in both Eastern's and Continental's employ. They have sought to influence an election and a possible determination by the NMB that Texas Air/Continental/Eastern is a single carrier.

28. Throughout the transfer of assets and work opportunities, Eastern officials explicitly stated that the transfers to Continental were designed to: avoid and reduce labor costs under the existing bargaining agreements; force Eastern employee groups to accept further cuts in wages and benefits, and undermine the unions' exclusive representative status.

In addition to the above, further indications of anti-union bias are found in the following findings.

29. In November 1986, a speech delivered by Frank Lorenzo in Japan before an investment group read:

We will be negotiating with Eastern's unions to develop a compensation framework that allows Eastern to survive intact and I would hope that Eastern's unionized employees will choose to be part of a profitable airline with profit-sharing and incentive payments that replace job-destroying high cost labor contracts.

On the other hand we are realistic enough to know that Eastern's union leadership, as differentiated from the workers themselves, may not easily concede these issues and that we must be able to negotiate from a position of strength. These are complex issues, but I can assure you that we have considerable leverage. *For example, if necessary, Eastern aircraft can be repainted*

*and moved over to Continental where they would be flown by non-union pilots. This flexibility should improve the chances of negotiating fair and economic contracts with Eastern's unions.*

(Px. 30) (emphasis added).

30. In a December 2, 1986 video tape of comments to Continental's pilots, contemporaneous with Texas Air's acquisition of Eastern, Lorenzo stated:

There are some of [you] who might not be familiar with my feelings on unions and associations. I would not have made the comments three or four years ago that I am about to say now. I have been involved with this company for 15 years, and I have seen it both ways. It has not been until the last three years that I have truly understood how difficult and how bad a union environment is and how it weakens the position of the employees over the long term.

(Px. 25, px. 28 at 6)

31. In Eastern's July 21, 1987 *Falcon*, an Eastern publication, President and Chief Executive Officer Phil Bakes is quoted as saying:

The assets Eastern uses are eventually going to be part of a competitive cost structure. The question is whether they are going to be in a competitive costs structure with the people of Eastern operating these assets or some foreign airline, some *affiliated airline* or some other company [operating them] ... The only thing that is going to provide job security and paychecks is a healthy or 'low' cost structure.

(Px. 13 at 1–2) (emphasis added).

32. The March 11, 1987 edition of the *Falcon* carried a report of a news conference held by Bakes before the Miami news media:

Union leaders must know, too.

Let's hope not only the people I've mentioned, but the people that have a stewardship in union positions also know what has to be done and have the courage to do it. Because, we will try our damnest to make sure it is a good atmo-

sphere where we can have these discussions.

We can help bring this about in a way smoother than it can be brought about in any other way. Although we want to make a return on the assets of the company by operating them at Eastern Airlines, if we fail in this mission, those assets will have a return one way or another. That you can count on.

33. The September 16, 1987 minutes of Eastern's Executive Committee meeting reported that Phil Bakes:

[R]eviewed the current situation of labor agreements with the Company's three unions and the likely course of negotiations with the IAM. He noted disruption from union activities, the Company's poor financial performance and continuing revenue and yield problems. He stated that the Company may not be able to down-size piecemeal and cut overhead efficiently and that as a prudent course of action, it was looking at disposing of whole segments of the airline.

34. In his "Message from the President" in the November 1987 edition of the *Falcon*, Phil Bakes stated:

The long-term answer to Eastern's problem is a revamped labor cost structure. Lacking that, further reductions and restructuring may be necessary ... If improved financial performance cannot be achieved by operating the assets, we will consider selling assets ... other ways must be found to position Eastern's assets to provide a financial return.

35. In a 1988 special edition of the *Falcon*, Bakes stated that Eastern will continue to transfer assets absent a reduction in "union labor costs":

Selling assets isn't a threat—that's been clearly demonstrated by 1987's aircraft sales and more recently, the Texas Air subsidiary's acquisition of the Air Shuttle. It's a very real situation that will continue and that Eastern people must be prepared to face ...

36. The same 1988 *Falcon* also reported:

EAL *can* make a comeback ... if labor costs [are] restructured soon....

[President Phil Bakes] points out that Eastern has had some measure of market share success by introducing a unique fare structure for the business traveler at major hubs. And, restructuring labor costs among the *union-free* groups has been successful.

*Id.* (emphasis added).

37. In a July 21, 1988 telephone conversation with Daniel M. Kasper, David Kuntsler, Eastern's Vice President for Planning, stated that if no "labor resolution" is reached Eastern will need to continue selling aircraft. [Px. 32; Tr. Aug. 15 at 213 (Bavis).] In the year prior to June 1988, the only major component of Eastern to make a profit was the Eastern shuttle. [Tr. Aug. 19 at 206–207 (Kasper)]. According to Eastern's expert witness, Daniel Kasper, an airline seeking to stabilize by returning to its "core routes" should preserve those portions of the airline where it enjoys competitive advantages over other carriers. [Tr. Aug. 19 at 201–208 (Kasper)]. Yet despite the fact that the shuttle was Eastern's only profitable segment, it was the first component that Eastern tried to spin off in 1988. [Tr. Aug. 17 at 112 (Bakes)].

The clear and obvious targets of the downsizing are Eastern's unions and their collective bargaining agreements. As Mr. Kuntsler testified on the day the proposed downsizing was announced:

[U]ntil we restructure our labor costs and get this airline back on a sound footing where we can invest in the product and begin to undo the great damage to the revenue-generating capability of this airline that has occurred in the past several years, then really almost everything has to be for sale ...

(Kuntsler Dep. at 78).

38. Similarly, Robert Ferguson, a Texas Air Vice President, emphasized that there was no rational economic stopping point to Eastern's strategy of shrinkage until the unions acquiesced:

Eastern has made the decision, if it can't get its costs restructured, it will allow its operation to shrink. It will sell assets as

necessary to either continue to fund the remainder of its operation or to retire its debts.

In that respect, the departure of pilots saves on furlough pay and other things. It is a nice, orderly way to allow the airline to shrink.

(Ferguson Dep. at 132).

*Charges of Illegal Union Conduct*

39. Eastern has presented no credible evidence of illegal or improper actions by the plaintiff unions. Aggressive union activity in support of the legitimate rights of employees is not unlawful. There is no showing that any union employee abused sick leave, or that there was a union directed or sponsored "sick out." Eastern has not presented any credible evidence of improper efforts by plaintiffs with regard to the sale of Eastern to its unions.

40. Eastern has not presented credible evidence that there was anything improper about the "Max Safety" program. The goal of that program, implemented by ALPA pilots, was to improve Eastern's safety standards by sensitizing pilots and management to the need for adherence to basic aviation rules and regulations.

41. "Max Safety" was implemented in the wake of an increasing number of safety violations at Eastern which occurred after the Texas Air acquisition. In late November 1987, the Federal Aviation Administration ("FAA") issued a report finding that Eastern had a recent history of unacceptable maintenance deferral. It then proposed new procedures on maintenance schedules. In the spring of 1988, the FAA again reported favorably that deferred maintenance had begun to abate in the six months since the previous report.

42. During 1986, Eastern's safety problems were intensified. Supervisors directed pilots to fly aircraft which, in the pilots' view, did not meet basic safety standards. Many pilots expressed concern that they would be singled out by Eastern for harassment or retaliation if they reported safety violations, such as equipment malfunctions. This led to ALPA initiating the safety program, which focused on pilot adherence to Federal Air Regulations and Eastern's aircraft safety manual.

43. There is no evidence that any pilot was encouraged to do anything but follow the aviation rules and regulations. The Court is also satisfied and finds that ALPA never discussed, approved, or directed any slowdown action or that "Max Safety" was an ALPA approved or directed illegal slow down action.

## III.

## CONCLUSIONS OF LAW

A. The Status Quo Requirements of the Act

■ The dispute provisions of the Railway Labor Act impose an obligation upon both the carrier and the union to preserve and maintain working conditions existing prior to a labor dispute. This obligation requires parties to exhaust the "purposely long and drawn out bargaining procedures of the Act before changing any working conditions." *Railway Clerks v. Florida E.C.R. Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966). The scope of the status quo extends to "actual, objective working conditions and practices, broadly conceived, which were in effect before the pending dispute arose and which are involved in or related to that dispute." *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969) ("*Shore Line*").

Managerial prerogatives may become part of the status quo if established by past practice. They need not be specifically included in a written labor contract, but will be recognized as part of the status quo if management has taken such actions in the past which have become part of the actual working conditions.

... [T]he status quo extends to those ... conditions [that] need not be covered in an existing agreement.... if apart from the agreement.... such [actions] had occurred for a sufficient period of time with the knowledge and acquiescence of

the employees to become in reality a part of the actual working conditions.

*Id.* at 153–54, 90 S.Ct. at 301.

**B. Schedule Changes and Hub Closures May Be Part of the Status Quo**

■ When a carrier has engaged in an activity long enough for the union to become aware of it and react accordingly, then absent objection by the union, it becomes a part of the actual status quo. *Baker v. United Transp. Union* 455 F.2d 149, 156 (3rd Cir.1971) (railroad had an established practice of freely changing instruction and examination sites without the union's consent; this management prerogative became part of the status quo).

■ In determining whether a proposed action is within the status quo, a court should consider analogous past practices. *International Ass'n of Machinists & Aerospace Workers v. Eastern Air Lines,* 849 F.2d 1481, 1487 (D.C.Cir.1988) (as amended) (if the shuttle sale is analogous to a hub closing, abandonment of a route or the sale of assets, then the question arises whether the proposed action is covered under the parties' established bargaining tradition). The status quo prevails where the proposal is similar both in nature and in degree to prior actions in which the unions acquiesced.

In *Independent Union of Flight Attendants v. Pan American World Airways,* 502 F.Supp. 1013 (D.D.C.1980) ("*IUFA*"), the union sought preliminary injunctive relief preventing Pan American from furloughing 1,097 flight attendants and closing flight attendant bases. But the court found that the union contract provided for furloughs and base closures, and uncontroverted evidence showed that the airline had furloughed a sizable number of attendants on four different occasions in the past and had closed bases on at least two prior occasions. The court held that because of previous interpretations of the collective bargaining agreement and past practices, the contract between the union and the airline authorized base closings and massive furloughs. It should be noted, however, that in *IUFA,* the parties were not engaged in Section 6 negotiations. There had been bargaining over the effect of the carriers' action, and the labor "agreement *specifically* vested the carrier with broad authority to close bases and furlough employees." *Id.* at 1018. (emphasis added). That is not the case in this litigation.

Before announcing its traditional September schedule and operational changes, Eastern had on occasions altered its routes and schedules serving different cities and adjusted the frequency of its flights. The airline had also closed hubs, including Houston, which it closed in 1984, and Charlotte, which it closed in 1986. On occasions, Eastern had also sold aircraft and related assets. Captain John J. Bavis, Chairman of ALPA's Eastern Master Executive Council, had acknowledged that Eastern was "free to sell any of the assets it owns as part of its business practices." National Mediation Board, 15 NMB No. 40, Tr. (June 23, 1988) at 2665.

The September schedule changes proposed by Eastern are similar to past actions. In light of the limited testimony presented, as to those practices, Eastern's right to effect schedule changes, flight reductions, and closure of the Kansas City hub, a threshold showing at least has been made, that Eastern should be permitted to implement such changes without first bargaining with plaintiffs. Testimony also supports the conclusion that the proposed operational changes are motivated by sound financial reasons. Even plaintiffs' experts agreed that Eastern has legitimate and compelling business reasons to withdraw from the Kansas City hub.

**C. Employee Furloughs Violate Status Quo Requirements**

■ Nonetheless, this Court is well aware that considerations of economic necessity are not enough to make a carrier's decision nonbargainable. The Supreme Court has stated that many business decisions are subject to bargaining, including management actions taken to eliminate wasteful practices. *See Order of Railroad Telegraphers v. Chicago & North Western Railway Co.,* 362 U.S. 330, 338, 80 S.Ct.,

761, 765, 4 L.Ed.2d 774 (1960) (*"Telegraphers"*) (carrier's unprecedented decision to consolidate and abandon numerous antiquated rail stations was a bargainable issue).

█ Defendant has failed to establish that the furloughing of 4,000 employees is consistent with past practice. Massive layoffs are not, and shall never be, business as usual. The Railway Labor Act requires Eastern to bargain with its unions before taking unilateral action to eliminate 12 percent of its workforce.

### 1. Furloughing 4,000 Employees Is Not Within The Status Quo

The proposed furlough involving approximately 1,000 machinists, 1,000 flight attendants and the elimination of 500 pilot positions is the largest overall job reduction in Eastern's history. The last significant pilot furlough was caused not by self-motivated operational changes but by the 1973 OPEC oil embargo. The 1981 PATCO strike nearly triggered a furlough which was overcome by successful negotiations between ALPA and management.

█ While it is true that the collective bargaining agreements contain furlough provisions,[4] they provide no justification for a wholesale restructuring of the airline workforce. Instead, such provisions have been used to implement minor operational "adjustments" and seasonal schedule changes. Defendant cannot now use these provisions to dismantle a significant portion of Eastern's labor force.

The Supreme Court has held that under the RLA, a union has the right to negotiate about the job security of its members. It has recognized that " '[c]ollective bargaining as to length or term of employment is commonplace.' " *Telegraphers*, 362 U.S. at

336, 80 S.Ct. at 765. In that proceeding, a carrier attempted to abolish numerous jobs held by station agents and telegraphers working at little-used railroad stations. Under Section 6 of the RLA,[5] the union notified the railroad of its desire to negotiate an amendment to its current agreement which would prevent the railroad from abolishing any position without the union's consent, and threatened to strike if the railroad refused to negotiate about the amendment. The railroad brought an action, alleging that the stations were wasteful and that it was within the company's business judgment to close them down and terminate the employees. The trial court ruled that since the proposed contract change related to "rates of pay, rules and working conditions," it was a bargainable issue under the RLA. The circuit court found that the changes were not bargainable and reversed the district court. The Supreme Court rejected the circuit court's view that any effort by the union to negotiate about the job security of its members was a challenge to legitimate managerial prerogative. *Telegraphers*, 362 U.S. at 336, 80 S.Ct. at 765. The Court noted:

> The Railway Labor Act and the Interstate Commerce Act recognize that stable and fair terms and conditions of railroad employment are essential to a well-functioning national transportation system. The Railway Labor Act safeguards an opportunity for employees to obtain contracts through collective rather than individualistic bargaining.

*Id.* at 336–37, 80 S.Ct. at 765. It found that the union was following the RLA in insisting that employees and their carriers try to negotiate controversies over working conditions. The union was entitled to ask for its contractual right to bargain with the railroad before the company took unilateral

---

4. Article 15 of the Agreement between Eastern and IAM, entitled "Seniority" addresses work force reductions (Dx. 21 at 39–43); Section 40 of the Agreement between Eastern and ALPA is entitled "Furloughs" (Dx. 15 at 167–70); and Section 15 of the Agreement between Eastern and TWU is entitled "Reduction in Force" (Dx. 35 at 49–51).

5. Section 6 of the Act provides: "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions...." 45 U.S.C. § 156 (1981). After such notice has been given, the rates of pay, rules, or working conditions shall "not be altered by the carrier until the controversy has been finally acted upon...."

action to abolish the jobs of numerous employees.

Several cases with facts analogous to the situation before this Court have followed the principle established in *Telegraphers*—that extensive proposed layoffs are subject to the RLA's mandatory negotiating procedures. In *United Indus. Workers v. Board of Trustees of Galveston Wharves*, 351 F.2d 183 (5th Cir.1965) (*"Galveston Wharves"*), a carrier announced that its employees would be permanently laid off within two weeks. The union requested negotiation, and commenced a strike when the carrier declined. The union also sought injunctive relief on the grounds that the carrier had failed to pursue the major dispute procedures of the RLA. The district court disagreed, holding that the collective bargaining agreement afforded some arguable basis for the job terminations and that such action was not subject to the mandatory bargaining provisions of the RLA. The Fifth Circuit reversed, however, concluding that the situation was actually a major dispute, which required the parties to bargain before laying off the employees. The Court noted that the carrier could point to "no provision of the contract giving it the contract right to make this decisive change." *Id.* at 190. The court explained that the announced action was clearly a change in "working conditions" and the union had the right to demand that the carrier comply with the mandatory bargaining procedures of the RLA. Recognizing that job terminations are the severest possible change, the court stated:

> [T]he very snarl these employees are in ... shows why an employer subject to the Railway Labor Act may have special obligations in pretermination bargaining. Suddenly from an action which is entirely legitimate and undoubtedly sound from an economic standpoint, employees of long standing find themselves with neither job nor representation continuity.

*Id.* at 191.

In *Air Line Pilots Ass'n, Int'l v. Wien Air Alaska*, 120 L.R.R.M. (BNA) 3388 [1984 WL 2527] (D.Alaska 1984), the airline argued that its announced actions were authorized by the furlough clause in its agreement with the union. It pointed to past furloughs, suggesting that the announced terminations fell within the status quo. It also claimed that the existing collective bargaining agreement placed no restriction on the number of pilots furloughed at any particular time. Because the airline was suffering from large operating losses, compounded by labor disagreements, the company announced a 25–day suspension.

The trial court stated that nothing in the course of ongoing negotiations gave the union notice that the airline would furlough its pilots. The court found no evidence that the carrier would rely on the furlough provision of its collective bargaining agreement to layoff all its pilots.

> The furlough provision has been consistently applied to permit the carrier to furlough pilots when scheduled operations were reduced by reason of seasonal factors or terminations of service to particular destinations. The evidence does not suggest that Wein's suspension of all scheduled flight operations was due to either of these purposes. Rather, the suspension of all scheduled flights was announced in order that the management might undertake the complete restructuring of scheduled operations.

*Id.* at 3391. The *Wien* court concluded that the union was entitled to preliminary injunctive relief maintaining the status quo.

■ Employers subject to the RLA must bargain with their unions even over fundamental decisions affecting the very scope and direction of the employer's enterprise. *See Railway Labor Exec. Ass'n v. Pittsburgh & Lake Erie R.R.*, 845 F.2d 420, 430 & n. 12 (3d Cir.1988), *pet. for cert. filed* 56 U.S.L.W. 3819 (U.S. May 17, 1988) (No. 87–1888) (*"Pittsburgh & Lake Erie"*) ("when a decision affects the very existence of workers' jobs, the RLA mandates bargaining"). Eastern's furloughing plan clearly constitutes such a decision.

The breadth of Eastern's proposed furloughs cannot be ignored. Defendant's

termination of 4,000 employees constitutes a "unilaterally instituted wholesale change[]" that it "seeks to establish permanently" by avoiding the RLA's bargaining process. *Florida E. Coast Ry. Co. v. Bhd. of R.R. Trainmen*, 336 F.2d 172, 179 (5th Cir.1964). The announced wholesale furloughing represents the restructuring of the airline as a *fait accompli*.

In the proceeding before this Court, the furlough provisions in the collective bargaining agreements with Eastern neither provide for nor were intended to authorize the furloughing of employees in order to permit the airline to reorganize. The agreements allow for furloughs in line with minor reductions in Eastern's schedule, but the carrier may not engage in a wholesale furlough of employees under those provisions for the purpose of administratively restructuring its operations.

### 2. *Violation of Current Collective Bargaining Rights*

Eastern cannot simply walk away from collective negotiations over the furlough issue to announce drastic cuts in its labor force in the imminent future.

■ Eastern and ALPA are currently engaged in major dispute bargaining under the RLA. On May 31, 1988, the parties exchanged Section 6 notices of their intent to renegotiate their collective bargaining agreement which became amendable on July 1, 1988. The notices triggered the applicability of the RLA's status quo requirements. Since then, the parties have met three times (June 21, July 6, and July 22, 1988) to engage in collective bargaining. During these meetings, they discussed amending the contract's furlough provisions. In particular, ALPA proposed that Eastern not furlough any pilot on the current Eastern Pilots System Seniority List in connection with any downsizing or restructuring. In its July 22nd announcement, Eastern presented its unilateral restructuring plan as an accomplished fact without providing ALPA any opportunity to bargain over the effects on Eastern's pilots. This unilateral activity dims prospects for successful Section 6 negotiations.

IAM and Eastern have also been negotiating changes in their collective bargaining agreement. In October 1987, they exchanged Section 6 notices, and after a short period of unsuccessful negotiations, Eastern unilaterally declared an impasse. In late January 1988, they began negotiations under the auspices of the National Mediation Board which resulted in a June 6, 1988 agreement. That agreement was contingent, however, on an overall contract agreement to maintain IAM-represented employees at various numerous Eastern stations. Four of the locations were prominently featured in defendant's July 22 downsizing announcement: Kansas City, Philadelphia, Las Vegas, and Minneapolis–St. Paul. The proposed downsizing will violate this agreement.

■ It is clear that both ALPA and IAM were involved in mandatory collective bargaining with Eastern over amendable contracts regarding the subject of furloughing, an issue central to defendant's present restructuring plan, prior to the July 22nd announcement. As already discussed, the RLA prohibits unilateral changes in employee working conditions while the parties are engaged in pre-existing Section 6 collective bargaining over an "expired" or amendable contract. *See e.g., Air Cargo, Inc. v. Local 851, Int'l Bhd. of Teamsters*, 733 F.2d 241, 244–47 (2d Cir.1984); *International Ass'n of Machinists v. Aloha Airlines*, 776 F.2d 812, 816 (9th Cir.1985).

TWU's agreement with Eastern is not amendable until December 31, 1988. When TWU's president heard about the proposed furloughs, she insisted that Eastern negotiate with the flight attendants' union over such drastic cuts. TWU even offered several proposals to Eastern which were rejected.

The Supreme Court has upheld a union's right to demand bargaining as to extensive abolition of work positions. *Telegraphers*, 362 U.S. at 337–38, 80 S.Ct. at 765. The Court emphatically rejected the railroad's contentions that the layoffs from station abandonments were not subject to the RLA's negotiation procedures:

[I]t is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective bargaining agreement, rather than to mere infractions or interpretations of the provisions of that agreement.

*Id.* at 341, 80 S.Ct. at 767.

### 3. *"Minor" Versus "Major" Disputes*

The distinction between a "major" and "minor" dispute is important. A "major dispute" arises from the formation or change of collective agreements covering rates of pay, rules, or working conditions. *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 722–27, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945). The RLA establishes elaborate machinery that must be followed for negotiation and mediation of major disputes. A "minor dispute," on the other hand, arises from the interpretation or application of an existing agreement. Such disputes must be submitted to the contractual grievance process and if not resolved there, to the binding authority of an adjustment board which exercises exclusive jurisdiction over the dispute. *See e.g., Andrews v. Louisville & Nashville R.R.,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972).

 Defendant argues that the proposed furloughing of 4,000 employees, if not part of the status quo, should be at most, a minor dispute. Defendant urges that it need only meet a low burden—that Eastern's interpretation of its rights under the collective bargaining agreements is "plausible."

Courts must be careful not to place undue emphasis on the contentions and maneuvers of the parties. Management will assert that its position is only an interpretation or application of the existing contract. Unions will obviously talk in terms of changes. Several circuits have rejected the formalistic "major" or "minor" labels and have examined whether a carrier is attempting to escape the lengthy RLA procedures though unilateral action. This substantive approach was laid out more than 25 years ago:

It is a major dispute if the present agreements between the railroad and the brotherhoods contain express provisions contrary to the position taken by the railroad or if the *clear implication of these agreements is inconsistent with the railroad's proposals.*

*Rutland Railway Corp. v. Brotherhood of Locomotive Eng'r,* 307 F.2d 21, 33–34 (2d Cir.1962). (emphasis added)

 This Court is not persuaded by defendant's allegation that the contracts can be construed to support its proposed furloughing. Eastern itself can only argue that the collective bargaining agreements "contemplate" such cuts. In stretching beyond the contract clauses for justification, Eastern is giving "artfully contrived formalistic ... responses" which do not constitute reasonable contractual interpretation. *International Bhd. of Elec. Workers v. Washington Term Co.,* 473 F.2d 1156, 1172 (D.C.Cir.) *cert. denied,* 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973). The distinction between minor and major disputes must be applied by looking to the substantive nature of the dispute rather than to its formalistic appearance or the manner in which the dispute occurred.

[D]isagreement as to interpretation of a contract, may under some circumstances be regarded as a major dispute. This result may be reached if it can be said that the change being imposed by one side on the other is in nowise contemplated or arguably covered by the agreement. The provisions of the Railway Labor Act may not be avoided merely through the device of unilateral action which the actor purposefully intends shall not become a part of the agreement. The major-minor dispute dichotomy does not relate to artfully contrived formalistic demands or responses, but to matters of substance.

*Switchmen's Union of N. America v. Southern Pacific Co.,* 398 F.2d 443, 447 (9th Cir.1968).

In this case, Eastern's severe furlough plan cannot be supported by a viable interpretation of the existing collective bargaining agreements. On the contrary, it is an attempt to avoid the major dispute process by taking unilateral action. That, of

course, violates the union's bargaining rights.

Numerous cases have followed the principle that proposed layoffs are major disputes. *See, Telegraphers*, 362 U.S. at 341, 80 S.Ct. at 767 ("But it is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective bargaining agreement, rather than to mere infractions or interpretations of the provisions of that agreement."); *Galveston Wharves*, 351 F.2d 183 (5th Cir.) (the dispute was major because the announced job terminations were a "decisive" change in working conditions).

In determining whether a proposed change to employees' working conditions triggers a major dispute, courts have looked at the extent of the change and whether it would expand the scope and effect of the existing labor contract beyond its intended parameters. If so, the court must find that there is a major dispute, subject to mandatory bargaining under the RLA. *See, Florida E. Coast Ry. Co. v. Bhd. of R.R. Trainmen*, 336 F.2d 172 (5th Cir.1964) (carrier's "wholesale changes" to the working conditions as provided for in the current agreement constituted a major dispute); *Railway Labor Executives Ass'n v. Consolidated R. Corp.*, 845 F.2d 1187 (3d Cir.1988) (railroad's addition of a drug screening component to employees' medical examinations, a unilateral activity with serious repercussions to the employees' working conditions, was a major dispute). These courts would not allow the existing collective bargaining agreements to cover such serious activities by the employer. Similarly, this Court refuses to extend the furloughing provisions to embrace the unilateral action taken by Eastern, the decimation of its unionized labor forces.

#### 4. *Collateral Estoppel Does Not Apply*

 Eastern argues that under the doctrine of collateral estoppel, the recent decision in *International Ass'n of Machinists & Aerospace Workers v. Eastern Air Lines*, 826 F.2d 1141 (1st Cir.1987), bars this Court from enjoining the furloughing of employees represented by IAM. The First Circuit held that since the district court had found that the furlough of 68 IAM-represented employees by Eastern constituted a minor, and not a major dispute, it lacked subject matter jurisdiction from issuing a preliminary injunction.

Defendant's collateral estoppel argument is not persuasive: only a small number of layoffs at one station at one time, were at issue. In the present matter, Eastern plans to furlough thousands of employees from every level of work, who are represented by three very diverse unions and stationed in dozens of cities across the country.

The issues of law differ as well. In *IAM*, the district court examined the collective bargaining agreement and found that certain articles covered the subjects in controversy. It concluded that the conflict was a minor dispute because it concerned disagreements over the meaning or coverage of an existing contractual provision. The district court, however, issued a preliminary injunction because the union met the traditional requirements for preliminary injunctive relief. The First Circuit reversed, holding that a district court does not have jurisdiction to enter a status quo injunction in a minor dispute.

In this case, three different collective bargaining agreements are at issue and none of them contemplate furloughs of this magnitude. In fact, two of the three unions were in the very process of negotiating over furloughs. The contracts require that the bargaining procedures of the RLA be followed. Because this destruction of the labor ranks qualifies as a major dispute, this Court has subject matter jurisdiction to enter an injunction and the parties must maintain the status quo while they exhaust the prescribed settlement procedures.

#### D. Eastern Must Exhaust the Section 6 Bargaining Process

 Section 6 procedures require that the carrier and the union give each other a 30–day notice of an "intended change in agreements affecting rates of pay, rules, or

working conditions." 45 U.S.C. § 156 (1981). Once the parties have invoked the major dispute settlement procedures, they must negotiate the changes, and if they are unable to resolve a dispute they may go before the NMB. 45 U.S.C. § 155 (1981). If mediation fails, the NMB will proffer binding arbitration. If the parties do not consent, they are released from mediation and the RLA's 30–day "cooling off" period is triggered. Only after this 30–day period has expired can a party engage in self-help. As clearly stated, "While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo*." *Railroad Trainmen v. Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969). During the major dispute process, the parties are entitled to an injunction, if necessary to preserve the status quo. *United Transp. Union v. Penn Central Transp. Co.*, 505 F.2d 542, 543 (3d Cir.1974) (per curiam).

The Supreme Court has set forth the rationale behind this duty to exhaust the process:

> [D]elaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout.

*Shore Line*, 396 U.S. at 150, 90 S.Ct. at 299.

That parties must exhaust the Section 6 process before changing the working conditions is well-recognized by the various circuits. *See Southern Ry. Co. v. Brotherhood of Locomotive Firemen & Enginemen*, 337 F.2d 127, 132 (D.C.Cir.1964) ("We regard Section 6 of the Railway Labor Act, which would be violated if the working conditions existing under the old contract were changed before the Mediation Board acts finally, as sufficient to uphold the District Court's jurisdiction to issue the injunction"); *Manning v. American Airlines, Inc*, 329 F.2d 32, 34 (2d Cir.) *cert. denied* 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964) ("The effect of § 6 is to prolong agreements subject to its provisions regardless of what they say as to termination.")

Section 6 must be read in conjunction with the implicit status quo requirement in the obligation imposed upon both parties by Section 2, First, to "exert every reasonable effort to make and maintain agreements." 45 U.S.C. § 152, First (1981). The RLA specifically provides:

> No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in [the RLA's major dispute process].

45 U.S.C. § 152, Seventh (1981). Before making a substantial change for which no labor contract provides in the rates of pay, rules, and working conditions of 4,000 employees, Eastern must pursue the RLA's major dispute process.

Having triggered a major dispute and having been served with Section 6 notices by its unions, Eastern must wait until the bargaining process is complete before it furloughs its employees. Once notice is given, "the procedure of § 6 [is] set in train," giving the union "a right to bargain." *Galveston Wharves*, 351 F.2d at 190. The unions have the "right to talk— at least talk—about a matter so vital to the welfare of [their] membership . . . ." *Id.*

Eastern is attempting to circumvent the bargaining process by unilaterally announcing that it will lay off 4,000 workers without pursuing the mandatory negotiation procedures. If the company is allowed to furlough this large group of employees without exhausting the bargaining procedures, it will not only alter the status quo, but moot a central issue of the current negotiations. As one circuit observed, "Bargaining is a sham if a Carrier has already done in fact what it formally seeks to do in negotiation of a Section 6 notice." *Florida E.C. Ry. v. Brotherhood of Ry. Trainmen*, 336 F.2d 172, 180 (5th Cir.1964).

**E. Eastern Must Bargain The Effects of its Furloughing Decision**

The RLA also requires a carrier to bargain over the effects of its proposed

changes. As the Third Circuit has recently stated, "There is much logic in applying this duty to bargain over effects...." *Pittsburgh & Lake Erie*, 845 F.2d at 431.

Even a case relied upon heavily by defendant, *First Nat'l Maintenance Corp. v. National Labor Relations Board*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), made it clear that an employer must bargain over the effects of any decision that has an impact on its employees. "There is no dispute that the union must be given a significant opportunity to bargain about these matters of job security as part of the 'effects' [of] bargaining mandated by [the NLRA]." *Id.* at 681, 101 S.Ct. at 2582. This "effects" bargaining "must be conducted in a meaningful manner and at meaningful times." *Id.* at 681–82, 101 S.Ct. at 2582. Because the parties' actions are subject to the Railway Labor Act, this meaningful manner is the procedure set forth in Section 6, and before Eastern can pursue its purposed furloughs, it must comply with the "intricate RLA bargaining *process.*" *Pittsburgh & Lake Erie*, 845 F.2d at 431 (emphasis in original).

**F. The Proposed Furlough Undermines Union Representation**

Sections 2, Third [6] and Fourth [7] of the RLA forbid carriers from interfering with or undermining the employees' choice of collective bargaining representative. 45 U.S.C. § 152, Third, Fourth. Where the employment relationship is defined by a collective bargaining agreement, action taken by the employer that is not provided for under the contract may very likely undermine the union's status as exclusive bargaining representative of the workers. *Tyson v. Teamsters Local 710*, 811 F.2d 1145, 1148 (7th Cir.1987). By terminating jobs

that the union members believed to be secure under their existing collective bargaining agreement, Eastern is sending a very clear message that ALPA, IAM and TWU are powerless to protect their members.

A carrier "is not free to destroy the process of collective bargaining and resolution of industrial grievances by wrongfully destroying the effectiveness of the chosen representative." *Brotherhood of R.R. Trainmen v. Central of GA Ry. Co.*, 305 F.2d 605, 608 (5th Cir.1962). Nor may the carrier use economic considerations as a guise for thwarting, frustrating, or undermining the effectiveness of the union's representation of its members.

Violations of Sections 2, Third and Fourth are not limited to representational disputes or circumstances in which the sole purpose of an employer's action is to destroy the union. Several recently decided cases demonstrate that such claims can be established outside a representational context where an employer seeks economic advantage or injury to a union. *See, Air Line Pilots Ass'n Int'l v. Transamerica Airlines, Inc.*, 817 F.2d 510, 515 (9th Cir.) *cert. denied*, —— U.S. ——, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987) (transfer of existing business flown by ALPA pilots to a non-union replacement subsidiary constituted an interference with representation and organization within the purview of 45 U.S.C. § 152 Third and Fourth); *Ruby v. TACA Int'l Airlines*, 439 F.2d 1359, 1364 (5th Cir.1971) (airline's attempt to unilaterally move its pilot base from New Orleans to El Salvador was a patent violation of the RLA's requirements that carriers must bargain collectively and refrain from interfering with labor organization); *Air Line Pilots Ass'n Int'l v. Eastern Air Lines*, 683 F.Supp. 845, 851 (D.D.C.1988) (East-

---

**6.** Section 2, Third provides in part:

> [N]o carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

45 U.S.C. § 152, Third (1981).

**7.** Section 2, Fourth provides in part:

> Employees shall have the right to organize and bargain collectively through representa-

tive of their own choosing.... No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees....

45 U.S.C. § 152, Fourth (1981).

ern's contract with nonunion company to train pilots would unilaterally repudiate the Eastern/ALPA collective bargaining agreement and undermine the union's role as an effective bargaining agent for the pilots).

Permitting Eastern to furlough 4,000 employees while the parties are in the process of negotiating new collective bargaining agreements would nullify the three existing labor contracts and defeat the unions' current collective bargaining gains. If this Court allows Eastern to singlehandedly terminate these jobs without negotiation, the unions' ability to negotiate over furloughs in the future would be severely weakened. By walking away from the bargaining table and unilaterally furloughing 4,000 employees, Eastern wants to show its employees that no union can stop it.

G. Standard for Issuing a Preliminary Injunction

Under the Railway Labor Act, where there is a major dispute, plaintiffs are not required to establish the traditional equitable prerequisites of irreparable injury and a favorable balance of harms in order to obtain immediate injunctive relief. Major dispute status quo injunctions are mandatory without any consideration of the relative equities involved.

Indeed, our own circuit was among the first to reject the need for showing irreparable harm when considering an application for injunctive relief under the RLA. In *Southern Railway v. Brotherhood of Locomotive Firemen*, 337 F.2d 127, 133 (D.C. Cir.1964), the court held:

[W]e think that a showing of irreparable injury is not required before the instant status quo injunction may issue, particularly because the question before us is concerned with far more than the private rights and duties of the parties. In the first place, Section 6 of the Act imposing the duty to maintain the status quo contains no qualification to the effect that the carrier has no obligation to do so unless irreparable injury would otherwise result. Moreover, the public interest in peaceful settlement of labor disputes through utilization of statutory

procedures is also involved, and irreparable injury to the complaining party is not an element which bears significantly or relevantly on furthering the public interest.

*Id.* at 133–34.

Other courts have readily followed *Southern Railway* without regard to the traditional equitable criteria for preliminary relief. *See, Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R. Co.*, 802 F.2d 1016, 1021 (8th Cir.1986) (if the dispute is major, courts have "broad powers to enjoin unilateral action by either side in order to preserve the status quo while settlement procedures go forward. Such an injunction may issue without regard to the usual balancing of the equities"); *Carbone v. Meserve*, 645 F.2d 96, 98 (1st Cir.) *cert. denied*, 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981) ("A district court may enjoin either party from altering the status quo during the course of the proceedings, with no showing of irreparable harm."); *REA Express, Inc. v. Brotherhood of Ry. Clerks*, 459 F.2d 226, 230 (5th Cir.), *cert. denied*, 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972) (In a major dispute, "upon request by one of the parties, the federal court is required to issue a status quo order"); *see also, Shore Line*, 396 U.S. at 151–54, 90 S.Ct. at 300 (affirming status quo injunctions without any consideration of the traditional equitable factors).

Although a balancing of the harms and in particular a showing of irreparable injury is not necessary for issuance of a preliminary injunction, the Court finds that plaintiffs have satisfied the traditional criteria for such relief. Four thousand employees would lose their jobs as a result of Eastern's unilateral activity. The unions' collective bargaining relationship with Eastern, as well as their representative status among their members would be severely harmed. Such conduct could itself trigger lawful strikes under the RLA, and could irreparably damage the RLA's collective bargaining framework unless this Court immediately restores and maintains the relevant status quo working conditions

through injunctive relief. *See, Ruby v. TACA Int'l Airlines*, 439 F.2d at 1361 ("Conduct in violation of Section 2, Fourth is subject to restraint by federal court injunction regardless of whether such conduct also generates a major dispute"); *Brotherhood of R.R. Trainmen*, 305 F.2d at 609 (once it is established that the carrier intends to undermine the union's representation, "the public interest, if nothing else, would make injunctive relief appropriate if not compelled").

Defendant alleges that it will be extremely costly to maintain the current labor force. By furloughing 4,000 employees, Eastern claims that it will save several million dollars a month. A lawful strike by the three unions would however, cause economic hardship to the airline, its employees, its customers and the general public. This greater harm would be the consequence of leaving the resolution of the furloughing dispute to self-help by the parties. The very objective of the RLA is to avoid such potentially disruptive strikes by prohibiting parties from unilaterally abrogating their collective bargaining agreement before exhausting the mediation process. The Court concludes that the public interest will be best served by maintaining the status quo, and prohibiting Eastern from furloughing 4,000 employees. Eastern is required to comply with and exhaust the mandatory collective bargaining procedures as set forth in Section 6 of the Railway Labor Act.

### CONCLUSION

While Eastern has shown that it has occasionally reorganized its flying operations in the past with acquiescence by recognized unions, it has failed in this proceeding to establish that the furloughing of 4,000 employees is consistent with past practice. Eastern has attempted to circumvent the bargaining process by changing working conditions that are not allowed under its labor agreement, but instead were the very activities currently discussed in negotiations. Eastern must abide by the Railway Labor Act and bargain with its unions before pursuing unilateral action which would eliminate 12 percent of its workforce. The status quo must be maintained until the parties have exhausted the Section 6 bargaining process. Eastern must return to the bargaining table and negotiate over the proposed furloughs.

As counsel for the Air Line Pilots Association noted at the final argument, "Their [Eastern's] business decisions are their own. But give us our jobs. Don't let them take our jobs." [Tr. Aug. 22 at 194. (Linsey)]. By issuing a preliminary injunction enjoining Eastern from furloughing 4,000 employees, the Court is prohibiting Eastern from doing just that.

An appropriate Order shall be entered.